1 | Erwin J. Shustak (CA Bar No. 119152)
Jonah A. Toleno (CA Bar No. 209600)
2 | SHUSTAK & PARTNERS, P.C.
401 West "A" Street, Suite 2330
3 | San Diego, CA  92101
Telephone: (619) 696-9500
4 | Facsimile: (619) 615-5290

5 | Attorneys for Plaintiff

FILED

2008 MAY -5  PM 1: 40

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ KNK _____DEPUTY

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10

11 | IMAGENETIX, INC., a Nevada Corporation,

Case No.

'08 CV 0814 JLS POR

12 | Plaintiff,

13 | vs.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

14

15 | MONAVIE LLC, a Utah Limited Liability
Company; MONA VIE, INC., a Utah
16 | Corporation; MONARCH HEALTH SCIENCES,
INC., a Utah Corporation; DALLIN LARSEN,
17 | HENRY MARSH, RANDY LARSEN, AMY
COWLEY, JOHN BRIGHAM HART (a/k/a
18 | BRIG HART), LITA HART, STEVEN
MERRITT, GINA MERRITT, CORBIN
19 | ROUSH, HOLLY ROUSH, CHARLES KALB,
DEBORAH KALB, RONALD PRUDHOMME,
20 | BRENDA PRUDHOMME, EDWARD
ARISTIZABAL, SHELLY ARISTIZABAL,
21 | BRIAN CATTANO, JILL CATTANO,
MATTHEW CURTIS, KIMBERLY CURTIS,
22 | TINA DUPART (a/k/a TINA DAOUST), TODD
HARTOG, ANGELIQUE HARTOG, RODNEY
23 | HOWARD-BROWNE, ADONICA HOWARD-
BROWNE, MICKEY KARSHNER (a/k/a MICK
24 | KARSHNER), VICTORIA KARSHNER,
JASON LYONS, CARRIE LYONS, ANGEL
25 | MATOS, GRAYSON MAULE, KEN PORTER,
ROBERT ROBINSON, LINDA ROBINSON,
26 | DEVON ROBINSON, TODD SMITH, (a/k/a
RICHARD TODD SMITH), STEPHANIE
27
(caption continued on next page)
28

1
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  SMITH, FRANK SOUCINEK JR., CYNTHIA )
   SOUCINEK, BRIAN THAYER, JACQUELINE )
2  THAYER, BO VANPELT, CARRIE VANPELT,)
   as individuals; BLACK DIAMOND )
3  UNIVERSITY, INC., a California Corporation; )
   DARRELL UTTERBACH, TRACY )
4  UTTERBACH, JOSEPH LICCIARDI, )
   PATRICE LICCIARDI, ANDRE WALTON, )
5  (a/k/a KENNETH ANDRE WALTON), PENNY )
   WALTON, JAMES BELLACERA, (a/k/a JIM )
6  BELLACERA), DENISE BELLACERA, )
   KELLY BANGERT, JILLIAN BANGERT, )
7  ERIC M. GUTMAN, REBEKAH GUTMAN, as )
   individuals, and DOES 1-10,000, inclusive, )
8
                                            )
9              Defendants.                  )
                                            )
10                                          )
                                            )
11 _____)

12     Plaintiff, IMAGENETIX, INC., through its attorneys, SHUSTAK & PARTNERS, P.C.,

13 complaining of the above-named Defendants (collectively referred to hereinafter as "Defendants"),

14 as and for its Complaint alleges, upon information and belief except as otherwise particularly stated,

15 as follows:

16                        **JURISDICTION AND VENUE**

17

18     1.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121 (original

19 jurisdiction), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1338 (original

20 jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction). The state claims in this action are

21 brought pursuant to this Court's ancillary and pendent jurisdiction over such claims.

22     2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants are

23 conducting substantial business activities within this District.

24     3.     This Court has personal jurisdiction over Defendants because they conduct business

25 in this District using multiple interactive Internet websites used to market themselves, advertise and

26 sell their products, and recruit potential product distributors, including but not limited to

27

28

1    *www.monavie.com*,    *www.mymonavie.com*,    *www.brighart.com*,    *www.R3Global.com*,    and

2    *www.blackdiamonduniversity.com*.

3                                    **THE PARTIES**

4        4.       Plaintiff IMAGENETIX, INC. ("Imagenetix") is and was at all times relevant to this

5
     action a corporation organized under the laws of the State of Nevada with its principal place of
6
     business at 10845 Rancho Bernardo Road, Suite 105, San Diego, California 92127.
7

8        5.       Defendant MONAVIE LLC ("MonaVie LLC") is and was at all times relevant to

9    this action a limited liability company organized under the laws of the State of Utah. MonaVie

10   LLC's principal place of business is at 10855 River Front Parkway, Suite 100, South Jordan, Utah

11   84095.

12
         6.       Defendant MONA VIE, INC. ("Mona Vie, Inc.") is and was at all times relevant to
13
     this action a corporation organized under the laws of the State of Utah. Mona Vie, Inc.'s principal
14
     place of business is at 10757 River Front Parkway, Suite 110, South Jordan, Utah 84095.
15

16       7.       Defendant MONARCH HEALTH SCIENCES, INC. ("Monarch Health") is and was

17   at all times relevant to this action a corporation organized under the laws of the State of Utah.

18   Monarch Health's principal place of business is at 1946 Ridgehill Drive, Bountiful, Utah 84010.

19       8.       Upon information and belief, Defendants MonaVie LLC, Mona Vie, Inc., and

20   Monarch Health Sciences, Inc. (collectively referred to hereinafter as "MonaVie") are regularly

21
     conducting substantial business within this District, including marketing themselves and their
22
     images, soliciting customers, and recruiting potential MonaVie distributors through interactive
23
     Internet websites that are accessible and accessed by individuals residing in this District, such as
24

25   *www.monavie.com*,    *www.mymonavie.com*,    *www.brighart.com*,    *www.monavieforum.net*,    and

26   *www.R3Global.com*.

27

28

9.     Defendant DALLIN LARSEN ("Dallin Larsen") is and was at all times relevant to this action an individual residing in the State of Utah.  Upon information and belief, Dallin Larsen is the Founder and President of MonaVie.

10.     Defendant HENRY MARSH ("Henry Marsh") is and was at all times relevant to this action an individual residing in the State of Utah.  Upon information and belief, Henry Marsh is an Executive Vice President and Cofounder of MonaVie.

11.     Defendant RANDY LARSEN ("Randy Larsen") is and was at all times relevant to this action an individual residing in the State of Utah.  Upon information and belief, Randy Larsen is an Executive Vice President and Cofounder of MonaVie.

12.     Defendant AMY COWLEY ("Amy Cowley") is and was at all times relevant to this action an individual residing in the State of Utah.  Upon information and belief, Amy Cowley is an Executive Vice President of MonaVie.

13.     Defendants Dallin Larsen, Henry Marsh, Randy Larsen, and Amy Cowley are collectively referred to hereinafter as the "MonaVie Executives" or the "Executives".

14.     Defendants JOHN BRIGHAM HART, a/k/a BRIG HART ("Brig Hart"), and LITA HART are and were at all times relevant to this action individuals residing in the State of Florida.  Upon information and belief, Defendants Brig Hart and Lita Hart are and were at all times relevant to this action a married couple.

15.     Defendants STEVEN MERRITT and GINA MERRITT are and were at all times relevant to this action individuals residing in the State of Florida.  Upon information and belief, Defendants Steven Merritt and Gina Merritt are and were at all times relevant to this action a married couple.

16.     Defendants CORBIN ROUSH and HOLLY ROUSH are and were at all times relevant to this action individuals residing in the State of Oklahoma.  Upon information and belief,

1   Defendants Corbin Roush and Holly Roush are and were at all times relevant to this action a

2   married couple.

3       17.    Defendants CHARLES KALB and DEBORAH KALB are and were at all times

4   relevant to this action an individual residing in the State of Florida.  Upon information and belief,

5   Defendants Charles Kalb and Deborah Kalb are and were at all times relevant to this action a

6

7   married couple.

8       18.    Defendants RONALD PRUDHOMME and BRENDA PRUDHOMME are and were

9   at all times relevant to this action an individual residing in the State of Florida.  Upon information

10  and belief, Defendants Ronald Prudhomme and Brenda Prudhomme are and were at all times

11  relevant to this action a married couple.

12      19.    Defendants EDWARD ARISTIZABAL and SHELLY ARISTIZABAL are and were

13  at all times relevant to this action individuals residing in the State of Florida.  Upon information and

14

15  belief, Defendants Edward Aristizabal and Shelly Aristizabal are and were at all times relevant to

16  this action a married couple.

17      20.    Defendants BRIAN CATTANO and JILL CATTANO are and were at all times

18  relevant to this action individuals residing in the State of Florida.  Upon information and belief,

19  Defendants Brian Cattano and Jill Cattano are and were at all times relevant to this action a married

20  couple.

21

22      21.    Defendants MATTHEW CURTIS and KIMBERLY CURTIS are and were at all

23  times relevant to this action individuals residing in the State of Florida.  Upon information and

24  belief, Defendants Matthew Curtis and Kimberly Curtis are and were at all times relevant to this

25  action a married couple.

26      22.    Defendant TINA DUPART (a/k/a TINA DAOUST) is and was at all times relevant

27  to this action an individual residing in the State of California.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

23.    Defendants TODD HARTOG and ANGELIQUE HARTOG are and were at all times relevant to this action individuals residing in the State of California.  Upon information and belief, Defendants Todd Hartog and Angelique Hartog are and were at all times relevant to this action a married couple.

24.    Defendants RODNEY HOWARD-BROWNE and ADONICA HOWARD-BROWNE are and were at all times relevant to this action individuals residing in the State of Florida.  Upon information and belief, Defendants Rodney Howard-Browne and Adonica Howard-Browne are and were at all times relevant to this action a married couple.

25.    Defendants MICKEY KARSHNER and VICTORIA KARSHNER are and were at all times relevant to this action individuals residing in the State of California.  Upon information and belief, Defendants Mickey Karshner and Victoria Karshner are and were at all times relevant to this action a married couple.

26.    Defendants JASON LYONS and CARRIE LYONS are and were at all times relevant to this action individuals residing in the State of Florida.  Upon information and belief, Defendants Jason Lyons and Carrie Lyons are and were at all times relevant to this action a married couple.

27.    Defendant ANGEL MATOS is and was at all times relevant to this action an individual residing in the United States Territory of Puerto Rico.

28.    Defendant GRAYSON MAULE is and was at all times relevant to this action an individual residing in the State of Florida.

29.    Defendant KEN PORTER is and was at all times relevant to this action an individual residing in the State of Utah.

30.    Defendants ROBERT ROBINSON and LINDA ROBINSON are and were at all times relevant to this action individuals residing in the State of Florida.  Upon information and

belief, Defendants Robert Robinson and Linda Robinson are and were at all times relevant to this action a married couple.

31.    Defendant DEVON ROBINSON is and was at all times relevant to this action an individual residing in the State of Florida.

32.    Defendants TODD SMITH (a/k/a RICHARD TODD SMITH) and STEPHANIE SMITH are and were at all times relevant to this action individuals residing in the State of Florida. Upon information and belief, Defendants TODD SMITH and STEPHANIE SMITH are and were at all times relevant to this action a married couple.

33.    Defendants FRANK SOUCINEK, JR., and CYNTHIA SOUCINEK are and were at all times relevant to this action individuals residing in the State of Florida. Upon information and belief, Defendants Frank Soucinek, Jr., and Cynthia Soucinek are and were at all times relevant to this action a married couple.

34.    Defendants BRIAN THAYER and JACQUELINE THAYER are and were at all times relevant to this action individuals residing in the State of Florida. Upon information and belief, Defendants Brian Thayer and Jacqueline Thayer are and were at all times relevant to this action a married couple.

35.    Defendants BO VANPELT and CARRIE VANPELT are and were at all times relevant to this action individuals residing in the State of Oklahoma. Upon information and belief, Defendants Bo VanPelt and Carrie VanPelt are and were at all times relevant to this action a married couple.

36.    Defendant BLACK DIAMOND UNIVERSITY, INC., is and was at all times relevant to this action a corporation organized under the laws of the State of California. Upon information and belief, Black Diamond University, Inc. actively owns and operates a MonaVie product marketing website at *www.blackdiamonduniversity.com*.

37.    Defendants KELLY BANGERT and JILL BANGERT are and were at all times relevant to this action individuals residing in the State of California. Upon information and belief, Defendants Kelly Bangert and Jill Bangert are and were at all times relevant to this action a married couple.

38.    Defendants DARRELL UTTERBACH and TRACY UTTERBACH are and were at all times relevant to this action individuals residing in the State of California. Upon information and belief, Defendants Darrell Utterbach and Tracy Utterbach are and were at all times relevant to this action a married couple.

39.    Defendants JOSEPH LICCIARDI and PATRICE LICCIARDI are and were at all times relevant to this action individuals residing in the State of California. Upon information and belief, Defendants Joseph Licciardi and Patrice Licciardi are and were at all times relevant to this action a married couple.

40.    Defendants ANDRE WALTON (a/k/a KENNETH ANDRE WALTON) and PENNY WALTON are and were at all times relevant to this action individuals residing in the State of California. Upon information and belief, Defendants Andre Walton and Penny Walton are and were at all times relevant to this action a married couple.

41.    Defendants JAMES BELLACERA and DENISE BELLACERA are and were at all times relevant to this action individuals residing in the State of California. Upon information and belief, Defendants James Bellacera and Denise Bellacera are and were at all times relevant to this action a married couple.

42.    Defendants ERIC GUTMAN and REBEKHA GUTMAN were at all times relevant to this action individuals formerly residing in the State of California, and now, upon information and belief, are residing in the State of Oregon. Upon information and belief, Defendants Eric Gutman and Rebekha Gutman are and were at all times relevant to this action a married couple.

43.     The Defendants described in Paragraphs 15 to 43, above, are referred to collectively hereinafter as the "Defendant Distributors" or "MonaVie Distributors". Upon information and belief, the Defendant Distributors named herein are all active distributors of MonaVie products who have achieved the ranking of "Black Diamond" Distributor or higher in accordance with the MonaVie Compensation Plan. A true and correct copy of the MonaVie Compensation Plan, dated March 3, 2008, and discussed in greater detail below, is marked and attached hereto as Exhibit "A". Also upon information and belief, Defendants Brig Hart and Lita Hart are one of the highest ranked, if not the top ranked distributors for MonaVie, conducting business as "Imperial Black Diamond Executives".

44.     Upon information and belief, Defendant Distributors are conducting substantial business regularly within this District, including marketing themselves and their images, soliciting customers, and recruiting potential MonaVie distributors through interactive Internet websites that are accessible and accessed by individuals residing in this District, such as *www.monavie.com*, *www.mymonavie.com*, *www.brighart.com*, *www.monavieforum.net*, *www.R3Global.com* and *www.blackdiamonduniversity.com*.

45.     Evidence which will be gathered during discovery and presented at trial will show that each Defendant was at all times relevant hereto a controlling person, agent, and/or alter ego of each other Defendant, and in doing the acts as herein alleged, was acting within the course and scope of his or its authority as such with the expressed and implied permission, instruction, knowledge, consent, and ratification of each other Defendant. Each Defendant did influence and govern each other Defendant with such a degree of unity of interest and ownership so that the individuality, and/or separateness, of each Defendant have ceased to exist.

46.     Imagenetix alleges that the facts hereafter are such that an adherence to the fiction of the separate existence of the Defendants would sanction a fraud or promote a miscarriage of justice.

47.   The evidence also will show that, more specifically, MonaVie and the MonaVie Executives controlled, approved, ratified, sponsored, and condoned the business activities of Defendant Distributors, including but not limited to those activities related to the sales, marketing, advertisement, distribution and dissemination of MonaVie products.

48.   The true names and capacities, whether individual, corporate, associate, or otherwise of the defendants named herein as DOES 1 through 10,000, inclusive, are unknown to Imagenetix at this time, who therefore sue DOES 1 through 10,000 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10,000 when the same are ascertained; DOES 1 through 10,000 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment. Imagenetix is informed and believes and thereupon alleges that each of DOES 1 through 10,000 is legally responsible in some manner for the events and happenings referred to herein, and directly and proximately caused the damages and injuries to Imagenetix as hereinafter alleged.

## SUMMARY OF THE CASE

49.   This case arises out of a scheme and conspiracy amongst Defendants whereby they conspired to, and continue to, falsely advertise the inclusion of Celadrin® ("Celadrin") in their products. Celadrin is a unique proprietary esterified fatty acid complex used to promote joint health and reduce inflammation.   Imagenetix exclusively owns a registered trademark (the "Celadrin Trademark") for Celadrin.

50.   MonaVie's products marketed under the label "MonaVie Active" include (a) a blend of juices purportedly extracted from acai and other berries, powdered concentrates, and (b) gels for oral consumption (collectively, the "MonaVie Active Products").   Defendants actively are using

Internet websites and other marketing techniques such as distributor conventions to falsely advertise en masse that MonaVie Active Products contain Celadrin.

51.     Defendants never obtained Imagenetix's permission, however, to use the Celadrin Trademark in connection with the sale, advertising or marketing of their products.  To the best of Imagenetix's knowledge, no Celadrin actually exists in Defendants' products.  Defendant MonaVie executives openly have admitted and claimed that no Celadrin is being used in manufacturing MonaVie products.

52.     Imagenetix neither sponsors nor approves of Defendants' use of the Celadrin Trademark.  Imagenetix is in no way affiliated or connected with Defendants, MonaVie, or MonaVie's products, whether through Celadrin or any other means.

53.     Defendants, acting in concert and conspiracy, are trading wrongfully on Imagenetix's distinguished reputation and goodwill by falsely advertising and marketing to the general public the inclusion of Celadrin in its products, via interactive Internet websites, Internet blogs, online "chat" forums, regular regional meetings, DVD's for sale on the Internet and other mass marketing schemes.  Defendants, and all of them, intentionally are using the Celadrin trademark without Imagenetix's permission in a manner that is likely to deceive, confuse and mislead the public as to the affiliation, sponsorship and/or connection of the Celadrin mark with MonaVie products.

54.     Defendants' infringing conduct as alleged herein constitutes violations of federal law actionable under Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1116, and 1125, and under the laws of the State of California as set forth herein, including trademark infringement, trademark dilution, unfair competition, and unjust enrichment.  As a result of Defendants' conduct, Imagenetix has suffered and will continue to suffer irreparable injury and accordingly brings this action for monetary and injunctive relief.

## MATERIAL ALLEGATIONS

**Overview of Imagenetix and Celadrin**

55.     Imagenetix is a well-established, globally recognized bioceutical company that develops products with pharmacological benefits.  Imagenetix focuses on science-driven products and pharmaceutical therapies related to conditions caused by inflammation, and patent-protected novel compounds which are sold as nutritional supplements.  Imagenetix markets its nutritional products under its own brand as well as nutritional and over-the-counter pain cream products on a private label basis.[1]

56.     One of the private label products Imagenetix manufacturers, markets and distributes is Celadrin.  Celadrin is a cellular lubricant manufactured in softgel (oral consumption) and cream (topical) forms used to reduce inflammation and joint discomfort.  Imagenetix and its team of scientists and medical advisors have invested enormous amounts of time, money and other resources into conducting costly clinical trials and developing the proprietary formula for Celadrin.

57.     On July 23, 2002, the United States Patent and Trademark Office issued to Imagenetix the Celadrin Trademark, Registration No. 2,599,153.  The Celadrin Trademark is a strong Trademark used only in a fictitious, arbitrary and fanciful manner and qualifies as a "famous mark" pursuant to the terms of 15 U.S.C. § 1125(c)(1).

58.     Celadrin consists of seventy-five percent (75%) of an esterified fatty acid complex, a scientifically studied composition that is created through a specific and proprietary "esterification" process.  Celadrin's esterified fatty acids, are, upon information and belief, the only esterified fatty acids in the world to have been scientifically and clinically demonstrated to significantly promote joint health and reduce inflammation.  Celadrin's matrix of esterified fatty acids have been

---

[1] Additional information about Imagenetix, its company profile, and branded products can be found at its website, www.imagenetix.net.

exclusively and clinically proven to be efficacious, through studies presented at numerous scientific meetings and published in premier medical journals.

59.    As a result of the scientific and clinical successes of Celadrin's proprietary esterified fatty acid complex facilitated by Imagenetix's exclusive efforts, professionals and consumers in the medical and health supplement industry regularly associate the phrase "esterified fatty acids" and their properties with Celadrin.  This association between Celadrin and "esterified fatty acids" is particularly pronounced when the mention of esterified fatty acids is accompanied by reference to any of the robust portfolio of scientific studies conducted on Celadrin's esterified fatty acid complex.

60.    Imagenetix also possesses, by way of a patent license agreement, the right to make, use and sell a patented compound called cetyl myristoleate, which is one of the fatty acid carbons of the Celadrin complex, United States Patent No. 5,569,676.  Cetyl myristoleate is a compound patented for use in treating symptoms of joint inflammation and is another component of Celadrin.

61.    Since registering the Celadrin Trademark, Imagenetix has retained various distributors to market and sell Celadrin to the general public.  Celadrin is widely available through retailers all over the world including Costco, Longs Drugs, Walgreens, and Bartell Drugs.

62.    Imagenetix has expended significant efforts and resources over the years to conduct clinical studies and promote, advertise and use the Celadrin Trademark so as to make the mark highly recognizable and distinguished to the consuming public.  Imagenetix's diligence has resulted in the public readily identifying products bearing the Celadrin Trademark as (a) originating from a single source, or, in the alternative, (b) originating from a source sponsored, affiliated, or connected with the owner of the Celadrin Trademark.

63.    As a result of Imagenetix's efforts, the consuming public also readily identifies Celadrin with a highly effective and reputable product supported by extensive scientific and

published medical studies.  Indeed, the globally recognized International Federation of Sports Medicine (FIMS) has selected Celadrin Topical Cream as its "Official Pain Relieving Cream". FIMS's goal since 1928 has been to provide the best medical care for the athletes of the summer and winter Olympic Games.  Celadrin now is endorsed by FIMS as the official pain relieving cream for the years 2008 until 2012.  This prominent endorsement and resulting visibility during the Olympic Games will continue to strengthen the consuming public's perception of the Celadrin Trademark as originating from a single source and from a source sponsored, affiliated, or connected with the Trademark owner.

64.    The amount of goodwill Imagenetix has amassed in connection with the Celadrin Trademark as a result of its diligence and expended resources is so great it cannot reasonably be quantified.  Imagenetix also has dedicated significant amounts of time and resources to promoting the Celadrin Trademark and protecting its exclusive right to use the Trademark, including filing this action against Defendants.

65.    Imagenetix has granted its distributors, through a licensing agreement (the "Imagenetix Licensing Agreement"), an exclusive license to use the Celadrin Trademark.  Pursuant to the Imagenetix Licensing Agreement, Imagenetix distributors have an exclusive right to sub-license by agreement to third party customers the right to market, advertise, promote, distribute and sell finished dietary supplement products and finished cosmetic products containing Celadrin.

**Overview of MonaVie and its Multi-Level Marketing Business Structure**

66.    MonaVie contracts for the manufacture of and supplies nutritional supplement products including juice and oral consumption gel, which MonaVie contends contains juices of acai, pomegranate, cranberry, blueberries, grapes and other berries. MonaVie also contracts for the manufacture of and supplies juice and gel products under a label called "MonaVie Active".  As set

forth in greater detail below, Defendants are actively and falsely advertising MonaVie Active products as containing Celadrin.

67.    MonaVie owns registered trademarks for its products, and upon information and belief, has filed its own actions in federal court for claims of trademark infringement against entities other than Imagenetix.

68.    Defendants operate through a "multi-level marketing" ("MLM") business distribution model.  MonaVie is the parent multi-level marketing company which markets its products directly to consumers by means of relationship referral and direct selling.  According to MonaVie's parent website, www.monavie.com, MonaVie is sold and distributed throughout the world, including the United States, Canada, Australia, New Zealand, Japan, and Brazil.

69.    MonaVie representatives solicit individuals to become salespersons, or "distributors", of MonaVie products.  Distributors receive a commission on each sale of MonaVie product.

70.    MonaVie distributors are encouraged to recruit as many people as possible to join their "downline".  Distributors also earn bonus compensation for the sales activity of those individuals in their "downline".  According to MonaVie's Compensation Plan, distributors are ranked based on the amount of MonaVie product they sell, with "Star" being the lowest ranking, ascending toward "Black Diamond" ranking and "Crown Black Diamond" being the highest.  See MonaVie Compensation, effective March 3, 2008, marked and attached hereto as Exhibit "A".

71.    Upon information and belief, MonaVie distributors are located all over the world and market MonaVie products globally using, among other methods, various interactive distributor websites.  Upon further information and belief, Defendant Distributors are all ranked "Black Diamond" or higher.

72.   MonaVie and its Executives maintain and exert control over the business conduct of MonaVie distributors by requiring the distributors to comply with the "MonaVie Policies and Procedures" (the "MonaVie Policies"), a copy of which is marked and attached hereto as Exhibit "B" and which is readily available for viewing on many distributors' websites.

73.   Sections 5.1 through 5.3 of the MonaVie Policies, under the Section heading "Advertising", provide in pertinent part:

*5.1 – INTELLECTUAL PROPERTY*
*MonaVie will not allow the use of its trade names, trademarks, designs, or symbols outside of corporate-produced and –approved sales aids by any person, including MonaVie Distributors, without prior written authorization from MonaVie.*

*5.2 – INDEPENDENT DISTRIBUTOR-PRODUCED MARKETING MATERIALS*
*Only Distributors who have achieved the rank of Black Diamond or higher may create and publish their own marketing materials, and/or other sales aids.* ***All items must be submitted and reviewed by MonaVie and must bear the appropriate review seal before being disseminated or displayed. Any modification subsequent to initial approval must also be reviewed by MonaVie and must also bear the appropriate review seal before being disseminated or displayed.***
*Distributors may not sell independently produced items in any type of package that also contains corporate-produced literature.*
*Distributors may not produce for sale or distribution any recorded Company events and speeches without written permission from MonaVie. Distributors may also not reproduce for sale or for personal use any recording of Company-produced audio or video tape presentations.*
*MonaVie further reserves the right to rescind approval for any sales tools, promotional materials, advertisements, or other literature, and Distributors waive all claims for damages or remuneration arising from or relating to such rescission.*

*5.3 – DISTRIBUTOR WEBSITES*
***If a Distributor desires to utilize an Internet web page to promote their business, they may do so through MonaVie's official website or through MonaVie approved replicating websites after entering into the Website License Agreement.*** *A copy of the Agreement can be obtained upon written request to*

*compliance@monavie.com.  Alternatively, Distributors who have achieved the rank of Black Diamond may develop their own web pages.  However, any Black Diamond who does so: (a) must use only text found on the Company's official website; (b) may not supplement the content of their website with text from any source other than the Company; (c) must register their site(s) with the Compliance department and receive written permission from Compliance prior to the site's public availability.  After initial approval to the website is obtained, the Distributor may not change or modify its website without the express written consent of the Company.  Failure to comply may result in disciplinary action up to and including termination of a Distributorship.*  See MonaVie Policies, Exhibit "B" (emphasis supplied).

74.    MonaVie and its Executives have, upon information and belief, explicitly and/or implicitly approved and/or ratified the business conduct of Defendant Distributors, including the tools, techniques, methods, forums, and statements used in connection with Defendant Distributors' sales, marketing and advertising of MonaVie and MonaVie Active products.

**Imagenetix's Initial Encounters with MonaVie Concerning Celadrin**

75.    During the first quarter of 2005, two of Imagenetix's Celadrin distributors each sold to Defendant MonaVie, in separate transactions, a small amount of Celadrin in raw material compound form (the "2005 Celadrin Sales").  These two transactions of Celadrin sales both were executed on a one-time basis.  No written contract was executed in connection with either of the 2005 Celadrin Sales.

76.    During the first quarter of 2005, Imagenetix provided to the two distributors a Certificate of Analysis (the "C of A") for Celadrin, which Imagenetix's distributors then provided to MonaVie.  The C of A sets forth, among other things, an analysis of Celadrin's contents and physical characteristics.  A true and correct copy of the C of A provided to MonaVie in 2005 is marked and attached hereto as Exhibit "C".  The C of A states that Celadrin is comprised in large part (75%) of an esterified fatty acid complex. (See Exhibit "C".)

77.   The two Celadrin distributors notified MonaVie and its representatives that *IF* MonaVie decided to purchase Celadrin in the future for inclusion in MonaVie products, then the distributors would grant MonaVie a sub-license to use the Celadrin Trademark in connection with MonaVie products.   The issuance of such a sub-license was entirely conditional on MonaVie agreeing to purchase Celadrin from either or both of the distributor(s).

78.   It was understood among MonaVie, the MonaVie Executives, and the Imagenetix distributors that, if subsequent to the 2005 Celadrin Sales MonaVie decided to include Celadrin in its products, MonaVie would contract with Imagenetix distributors for future purchases of Celadrin.

79.   Neither Imagenetix nor its distributors, nor any other Imagenetix representatives ever sold Celadrin to MonaVie subsequent to the 2005 Celadrin Sales.  Accordingly, neither Imagenetix nor its distributors granted MonaVie a license to use the Celadrin Trademark in any manner after the 2005 Celadrin Sales.  Upon information and belief, neither MonaVie nor its representatives purchased Celadrin from Imagenetix, Imagenetix's distributors, or any other source subsequent to the 2005 Celadrin Sales.

80.   On or around January 8, 2005, and February 16, 2005, MonaVie issued press releases (the "2005 Press Releases") advertising Celadrin as an ingredient in its products and emphasizing Celadrin's clinically studied health benefits.  A true and correct copy of MonaVie's press releases dated January 8, 2005, and February 16, 2006, are marked and attached collectively hereto as Exhibit "D".

81.   Shortly thereafter, in the first quarter of 2005, Imagenetix learned that MonaVie had issued the 2005 Press Releases. Imagenetix's Chief Executive Officer, William Spencer, questioned MonaVie's executives about their purported use of Celadrin.  MonaVie's executives represented that a certain amount of Celadrin had been added to MonaVie Active products.   Imagenetix determined that this amount, as represented by MonaVie, was not enough to be efficacious.   Mr.

1    Spencer, on behalf of Imagenetix, accordingly transmitted to MonaVie's representatives a written

2    correspondence in or around the first quarter of 2005, ordering MonaVie to immediately cease and

3    desist their use of Celadrin and the Celadrin Trademark. MonaVie represented that it would comply

4    with Imagenetix's cease-and-desist demand.

5    **Defendants' Trademark Infringement and False Advertising Concerning Celadrin**

6

7        82.    In early 2008, Imagenetix learned for the first time that MonaVie distributors had not

8    complied with Imagenetix's cease-and-desist demand of 2005, and were in fact employing, and had

9    been employing since 2005, mass marketing techniques to falsely advertise the inclusion of

10   Celadrin in MonaVie Active products and reference the Celadrin Trademark without Imagenetix's

11   permission.

12       83.    At all times relevant to this action, Defendants were and are operating interactive

13   websites to market, advertise, and sell MonaVie Active products, which they claim contains

14   Celadrin. The websites allow the general public to contact the site owner, make product purchases,

15

16   inquire about the products, watch videos, and even sign up to become a MonaVie distributor.

17   MonaVie also sponsors and holds large-scale conferences throughout the country, and upon

18   information and belief within this District, where individuals may buy and sell MonaVie products

19   and enlist as a distributor.

20       84.    On or around March 1, 2008, Imagenetix conducted a website search by entering the

21   terms "Celadrin" and "MonaVie" together on various Internet search engines.   Imagenetix

22   discovered that, after just one search on a single Internet search engine (*www.yahoo.com*), over ten

23

24   thousand (10,000) Web pages existed at that time wherein MonaVie distributors were falsely

25   claiming that MonaVie Active products contained Celadrin.    Other search engines such as

26   *www.google.com* also produced results comprising thousands of Web pages demonstrating

27   MonaVie distributors falsely advertising Celadrin in MonaVie Active products.

28

85.     Upon information and belief, no Celadrin existed in any MonaVie products as of March 1, 2008, nor does it exist in MonaVie products as of the filing date of this action.

86.     On or about March 20, 2008, William Spencer and other Imagenetix representatives, met with MonaVie Executives (Chief Operating Officer Dell Brown and Defendant Randy Larsen) to place them on notice that Defendants were wrongfully infringing on and diluting the Celadrin Trademark and falsely advertising the inclusion of Celadrin in MonaVie products.  (This meeting is hereinafter referred to as the "March 20, 2008 Meeting".)

87.     The MonaVie Executives verbally admitted at the March 20, 2008 Meeting to the Imagenetix representatives that, notwithstanding the May 2005 Press Release, Celadrin was *not* being added to MonaVie products at that time, nor had it been added since 2005.  The MonaVie Executives claimed that in 2005 it had ordered its distributors to cease advertising Celadrin as an ingredient in MonaVie products.

88.     Since the March 20, 2008 Meeting, however, Defendants, acting in concert and conspiracy, continue to actively and falsely advertise Celadrin as an ingredient in MonaVie Active products.  The Celadrin Trademark is highlighted on several distributor websites.  Imagenetix representatives have discovered video advertising footage, dated in or around February 2008, of Defendant Distributor Brig Hart speaking to the general public, explicitly describing Celadrin as an ingredient in MonaVie Active products and touting the health benefits of Celadrin.  In this same video, Brig Hart claims he has approximately 600,000 individual distributors in his MonaVie downline network.

89.     Defendants are allowing and approving MonaVie distributors, including Defendant Distributors, to advertise, in addition to false claims that Celadrin is an ingredient of MonaVie Active, Celadrin-related information on multiple MonaVie product distribution websites such as current updates and scientific studies about Celadrin and its health benefits.  Defendants also are

allowing MonaVie distributors to advertise as part of their efforts to market MonaVie Active products articles written about the effectiveness of Celadrin authored by Imagenetix's own Scientific Board Members.

90.    Defendants not only are mass marketing and selling MonaVie Active products under the false advertisement of Celadrin as an ingredient, they actively are recruiting other individuals to join the MonaVie marketing force.    Defendants have made available for public viewing on *www.brighart.com* a video of a Leadership Conference that took place on or about April 4 to April 6, 2008, in Atlanta, Georgia.    On the video, Defendant Dallin Larsen states at the conference that over 60,000, and possibly 65,000, individuals joined the MonaVie distributorship network as distributors over the past month.    He goes on to state that 18,000 individuals joined the MonaVie network in the week alone prior to the conference.

91.    In light of the exponential rate of MonaVie distributor expansion, and the fact that even the highest ranking distributors, such as Defendant (Imperial Black Diamond Executive) Brig Hart, are actively advertising Celadrin as an ingredient in MonaVie Active products and recruiting myriad individuals to join their network and make the same advertising claims as his, the true number of existing MonaVie distributors who are actually falsely advertising MonaVie Active products with Celadrin is simply countless.

92.    Upon information and belief, Defendants, acting in concert and conspiracy, are knowingly infringing upon Imagenetix's rights by misappropriating, falsely advertising, imitating, counterfeiting, trading on, and otherwise using the Celadrin Trademark without Imagenetix's permission, in a manner likely to cause confusion, mistake, and deception to the public as to the source and quality of Celadrin.    Defendants further are knowingly diluting, tarnishing, diminishing, and blurring the distinctiveness and strength of the Celadrin Trademark through their wrongful

conduct, particularly by touting the effectiveness of Celadrin while falsely advertising its inclusion in MonaVie Active products.

93.     Defendants also are actively and falsely advertising on their websites the inclusion of "esterified fatty acids" in MonaVie products, as well as publishing scientific studies conducted on *Celadrin* at Imagenetix's expense, so as to confuse and deceive the consuming public into believing that the source of the esterified fatty acids is the same source that owns the Celadrin Trademark.  In a further attempt to dilute, tarnish, diminish and blur the Celadrin Trademark, Defendants continue to manufacture, distribute, market and sell MonaVie Active products with an advertisement on their labels listing "esterified fatty acids" as an ingredient.

94.     Upon information and belief, the MonaVie Executives have misappropriated the C of A provided to them by Imagenetix distributors in 2005, and are working in concert and conspiracy with the other named Defendants wrongfully to use their knowledge of the esterified fatty acid component to enrich themselves at Imagenetix's expense.

95.     Quixtar, Inc. ("Quixtar"), successor in interest to Amway Corporation ("Amway") filed an action on March 18, 2008, for unfair competition against MonaVie, Inc., MonaVie LLC, Brig Hart, and other MonaVie distributors in the United States District Court, Utah District.  In its publicly accessible Complaint, Quixtar alleges that MonaVie and its distributors are deliberately misrepresenting to the consuming public the qualities and health benefits of MonaVie.  To the extent that Quixtar's allegations are true, Defendants in this action are further diluting, disparaging and diminishing the Celadrin Trademark by confusing, deceiving and causing mistake to the consuming public about the sponsorship, affiliation and/or connection between Imagenetix and MonaVie.

96.     Defendants' conduct was and is intentional, willful, wanton, malicious, oppressive, and reckless.  The conduct of each of the Defendants, and all of them, acting in concert and as each

other's controlling person, controlling entity, agent, and alter ego, constitutes violations of federal law under Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1116, and 1125, and of the laws of the State of California as set forth herein. Defendants' conduct further constitutes unfair competition and unjust enrichment at Imagenetix's expense.

97.    As a result of Defendants' conduct, Imagenetix has suffered and will continue to suffer irreparable injury and accordingly brings this action for monetary and injunctive relief.

98.    As a result of Defendants' conduct, Imagenetix has suffered damages, and will continue to suffer compensatory damages, in an amount according to proof but believed to be in excess of Seven Hundred Fifty Million Dollars and Zero Cents ($750,000,000.00), and punitive damages in excess of Five Hundred Million Dollars and Zero Cents ($500,000,000). Unless the declaratory and injunctive relief requested herein are granted, Imagenetix will likely suffer irreparable injury as a result of Defendants' conduct. Accordingly, Imagenetix brings this action for monetary damages and injunctive relief.

### COUNT ONE
### Trademark Infringement
### (Against All Defendants)

99.    Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

100.    Defendants' conduct as alleged herein constitutes infringement of the Celadrin Trademark registered in Imagenetix's name, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

101.   Defendants' conduct as alleged herein is and was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and/or treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT TWO
### Trademark Dilution and Blurring
### (Against All Defendants)

102.   Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

103.   Defendants' conduct as alleged herein constitutes dilution and blurring of the Celadrin Trademark registered in Imagenetix's name, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.  As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

104.   Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and/or treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT THREE
### False Advertising and False Designation of Origin
### (Against All Defendants)

105.   Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

106.   Defendants' conduct as alleged herein constitutes false advertising and false designation of origin, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).  As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

107.    Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and/or treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT FOUR
### Unfair Competition
### (Against All Defendants)

108.    Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

109.    Defendants' conduct as alleged herein constitutes unfair competition, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).    As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

110.    Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and/or treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT FIVE
### Common Law Trademark Infringement, Trademark Dilution, and Unfair Competition
### (Against All Defendants)

111.    Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

112.    Defendants' conduct as alleged herein constitutes common law trademark infringement, trademark dilution, and unfair competition.    As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

113.    Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and punitive damages and attorneys' fees.

## COUNT SIX
### Unfair Competition Under California Bus. & Prof. Code § 17200
### (Against All Defendants)

114.   Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

115.   Defendants' conduct as alleged herein constitutes unfair competition in violation of California Business and Professions Code § 17200.  As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

116.   Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and punitive damages and attorneys' fees.

## COUNT SEVEN
### Unjust Enrichment and Imposition of Constructive Trust
### (Against All Defendants)

117.   Imagenetix realleges and reasserts each allegation set forth above as if fully set forth herein.

118.   Defendants' conduct as alleged herein constitutes unjust enrichment under the laws of the State of California.  As a direct and proximate result of Defendants' conduct, Imagenetix has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.  Accordingly, Imagenetix demands that a constructive trust be imposed for Imagenetix's benefit on all revenues derived from the sale of any products manufactured by Defendants based on, arising out of, or otherwise derived from Defendants' wrongful conduct, including but not limited to trademark infringement, trademark dilution, false advertising and unfair competition.

119.   Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and punitive damages and attorneys' fees.

**JURY TRIAL DEMAND**

120.    Imagenetix requests a jury trial on all causes of action, which entitles it to a trial before a jury.

**DEMAND FOR RELIEF**

WHEREFORE, Imagenetix prays for judgment as to each Defendant, and all of them, jointly and severally, as follows, that:

A.    Defendants, and their agents, employees, servants, representatives, successors in interest, and all those in concert with Defendants, be preliminary and permanently enjoined from engaging in the conduct set forth in sub-paragraphs 1-7 herein;

1.    Advertising, marketing, counterfeiting, or otherwise using in any manner the Celadrin Trademark without Imagenetix's permission and approval;

2.    Manufacturing, creating, designing, marketing, selling, advertising producing, making, or otherwise using in any manner any product, that is likely to cause confusion, deception, or mistake or that dilutes or is likely to dilute the Celadrin Trademark;

3.    Engaging in any other conduct that tends to falsely represent, or is likely to confuse, mislead, or deceive purchasers, Defendants' customers, Imagenetix's customers, and other members of the public to believe that Defendants' products are connected with Imagenetix or are sponsored, approved, or licensed by Imagenetix, or are in any way connected or affiliated with Imagenetix;

4.    Further infringing upon and diluting the Celadrin Trademark;

5.    Further damaging Imagenetix's goodwill;

6.    Further engaging in unfair competition against Imagenetix; and

7.    Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs 1-7 herein;

B.    This Court issue a preliminary and permanent injunction ordering that Defendants MonaVie and MonaVie Executives issue and distribute a written mandate ordering each and all of its distributors, and their agents, employees, servants, representatives, successors in interest, to refrain from the conduct set forth in Paragraph A, subparagraphs 1-7, herein, or be subject to sanctions as deemed appropriate by this Court;

C.    This Court order Defendants to file with the Court and serve upon Plaintiff, within thirty (30) days following the issuance of an injunction, a report in writing and under oath setting forth the manner and form in which Defendants have complied with such injunction, pursuant to 15 U.S.C. § 1116.

D.    Imagenetix be awarded compensatory damages in an amount to be determined at the time of trial but believed to be in excess of Seven Hundred Fifty Million Dollars and Zero Cents ($750,000,000) and that such damages be enhanced and/or trebled to Two Billion Two Hundred Fifty Million Dollars and Zero Cents ($2,250,000,000) pursuant to 15 U.S.C. § 1117(a), or in the alternative, at Imagenetix's election, be awarded compensatory damages of up to One Million Dollars and Zero Cents ($1,000,000) per counterfeit mark for each type of goods sold by MonaVie pursuant to 15 U.S.C. § 1117(c).

E.    Imagenetix be awarded punitive damages in excess of Five Hundred Million Dollars and Zero Cents ($500,000,000);

F.    All gross revenues earned by Defendants through the time of trial as a result of their infringing, diluting, and otherwise wrongful conduct alleged herein be determined in an accounting, and thereafter disgorged and held in constructive trust and paid over to Imagenetix, and enhanced in the form of compensatory damages as appropriate under the exceptional circumstances of this case;

G.    Imagenetix recover its reasonable attorneys' fees, costs, and expenses incurred herein, as appropriate under the exceptional circumstances of this case;

H.    Imagenetix be awarded prejudgment and post-judgment interest at the legal rate; and

I.    Imagenetix recover such other and further relief as this Court deems just and proper.

DATED: May 5, 2008

Submitted by,

SHUSTAK & PARTNERS, P.C.
ERWIN J. SHUSTAK
JONAH A. TOLENO

_____
JONAH A. TOLENO

401 West "A" Street, Suite 2330
San Diego, CA 92101
Telephone: (619) 696-9500
Facsimile: (619) 615-5290

Attorneys for Plaintiff

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**EXHIBIT A**

Case 3:08-cv-00814-JLS-POR     Document 1     Filed 05/05/2008     Page 31 of 71

# THE MONAVIE COMPENSATION PLAN

EFFECTIVE MARCH 3, 2008



# M O N A · V I E

AT MONAVIE, OUR DISTRIBUTORS ARE OUR MOST IMPORTANT ASSET, AND WE REWARD THEM ACCORDINGLY WITH AN EXCEPTIONALLY GENEROUS COMPENSATION PLAN.

The first step is simple: achieve the rank of Star and then help others to become Stars in your MonaVie organization. The rest of the plan will take care of itself.

As you review the following 8 Ways to Earn Income through MonaVie's compensation plan, keep in mind that the AutoShip program (recommended but not required) is the surest way to maximize your commission choices and take full advantage of the compensation plan.



WAYS TO EARN INCOME WITH MONAVIE

- DIRECT SALES
- BULK ORDER BONUS
- FIRST ORDER BONUS
- STAR MAKER BONUS
- TEAM COMMISSIONS
- EXECUTIVE CHECK MATCH
- LEADERSHIP POOLS
- MULTIPLE BUSINESS CENTERS

## DIRECT SALES

Retail sales allow you to earn income by purchasing product at the wholesale price and then selling it at the retail price. The Preferred Customer program allows your customers who enroll in the AutoShip program a 15% discount on the retail price. You receive the difference between the wholesale price and the preferred customer price as a retail commission. In addition, distributors with at least 200 PV also receive the volume associated with preferred customer purchases (the volume being credited to their lesser volume leg) if their preferred customers place an order during the week their AutoShip processes. You don't need to be active* or qualified† to earn profit from sales made to retail or preferred customers.

## FIRST ORDER BONUS (FOB)

Qualified distributors with at least 200 PV earn a one-time-only FOB of 20% of the PV (up to a maximum of $40), and qualified distributors with 100–199 PV earn a one-time-only FOB of 10% of the PV (up to a maximum of $20) when their personally sponsored distributors place a first time order of MonaVie products. If you are not qualified in the week the first order is placed, you will have the following three weeks to become qualified in order to earn the FOB.

## STAR MAKER BONUS

Qualified distributors with at least 200 PV may participate in our Star Maker Bonus. Each time one of your personally sponsored distributors reaches the rank of Star, the foundation for a successful MonaVie business, you earn a $40 Star Maker Bonus.

## BULK ORDER BONUS (BOB)

Each time someone you've personally sponsored places a bulk order, you receive one of the following bonuses: $25 (3 cases), $50 (6 cases), or $75 (12 cases). Please note that you must be active with at least 200 PV to receive the above mentioned BOB. Distributors active with 100 PV receive a BOB of $10 (3 cases), $20 (6 cases), or $30 (12 cases).

Direct sales, BOB, FOB, and the Star Maker bonus are designed primarily to help new distributors begin earning income with MonaVie, while Team Commissions, Executive Check Match, and our leadership pools are designed for wealth creation.

*Active is when a distributor is active in a 100 PV order.
†Qualified is when a distributor is personally sponsored two active distributors on term left and right.

# TEAM COMMISSIONS

**TEAM COMMISSIONS ARE THE FUNDA-MENTAL BUILDING BLOCK OF THE MONAVIE COMPENSATION PLAN. AS A NEW DISTRIBUTOR, YOUR FOCUS WILL BE ON CREATING RETAIL AND PREFERRED CUSTOMERS, AS WELL AS BUILDING AN ORGANIZATION OF DISTRIBUTORS.**

The team commissions portion of our plan is binary. Binary means that you will be placed in one of two legs (right or left) in your sponsor's organization. You will then be compensated based on successfully building two legs of your own. Your sponsor (or anyone else in your upline) may also place people in your organization. As your group begins to grow, you are entitled to team commissions based on the total volume generated in your lesser leg.





Calculating team commissions: If you and your two personally sponsored distributors are active with at least 100 PV, you qualify for up to 10% in team commissions.*

Team commissions are earned on your lesser volume leg and begin at 500 accumulated GV (group volume) on this leg, and on every 100 points thereafter. Any unpaid team volume carries over to the following week, as long as you remain active. For team commissions to be paid in subsequent weeks, there must be a minimum of 500 accumulated GV. Any week your personal volume is over 200 PV, the overage will be applied to your lesser volume leg. Team commissions are limited to $10,000 per week, per business center.

Although team commissions may be earned by being active with 100 PV, you can maximize your earnings with our FOB, BOB, and Star Maker Bonus by remaining active with 200 PV.

* Equates to earning 5% of the balanced volume from both your left and right legs.

1

# EXECUTIVE CHECK MATCH

To reward our executive field leaders, we have created the Executive Check Match program. This program allows you to earn an Executive Check Match on the team commissions paid to distributors you personally sponsor, the distributors they personally sponsor, and so on—up to seven generations of executives in your personal enrollment tree. As your Executive rank increases, so does the number of generations on which you can be paid an Executive Check Match.

You may earn an Executive Check Match not only on executives found in each of your personal enrollment tree legs, but also on distributors at the various Star ranks. A generation ends when a qualified executive is found, regardless of depth. The Executive Check Match has unlimited width. Therefore, to maximize your income, continue advancing to higher Executive ranks and personally sponsoring distributors, thereby creating more personal enrollment tree legs on which you can earn an Executive Check Match.

Figure 1 is designed to help you better understand the Executive Check Match program. In the example, you are a qualified Ruby Executive, which enables you to earn an Executive Check Match through four generations of executives on each of your six personal enrollment tree legs.

Once a qualified executive is found on any leg, it completes the first generation of executives for that particular leg.



## AT-A-GLANCE

- The higher your rank, the more generations you match.

- A generation ends when an executive is found.

- Bronze Executives and above must be active with at least 200 PV to earn an Executive Check Match.

- An Executive Check Match is paid on team commissions earned by all distributors in your enrollment tree.

Let's look at the leg that begins with Mr. B. In this leg, you would earn an Executive Check Match through Ms. E1 because she is the fourth generation executive. To be paid deeper on this leg (allowing you to earn an Executive Check Match on Mr. F1), you would need to advance to Emerald Executive, which would allow you to be paid through five generations of executives.

On the personal enrollment tree leg that begins with Mrs. C, you would earn an Executive Check Match on Mr. K and Mr. L, and that would end your first generation.

Let's look at one final example. On the personal enrollment tree legs beginning with Mr. F and Ms. G, no executive exists in either of these two lines; therefore, everyone in these two lines is considered first generation.

To maximize your earnings with the MonaVie Executive Check Match program, you should strive to reach our highest Executive ranks by sponsoring and supporting as many personal enrollment tree legs as possible.

The Executive Check Match is paid weekly and is based on a floating percentage. MonaVie guarantees a 50% weekly payout of commissionable volume. After the various other ways of earning commissions with MonaVie are calculated, any remaining available commissions (up to the 50% figure) are allocated to the Executive Check Match and then paid, along with other earned commissions for the week. Bronze Executives and above must be active with at least 200 PV to earn an Executive Check Match. Weekly commissions from an Executive Check Match cannot exceed the volume from your lesser volume leg.

PERSONAL ENROLLMENT TREE

Figure 1



| Executive Ranks | Generation Paid |
| --- | --- |
| Bronze | 1 |
| Silver | 2 |
| Gold | 3 |
| Ruby | 4 |
| Emerald | 5 |
| Diamond | 6 |
| Blue Diamond | 7 |

Purple = 1st generation distributors
Green = 2nd generation distributors
Orange = 3rd generation distributors
Red = 4th generation distributors
Silver = 5th generation distributors

* Represents your personally sponsored distributors. These distributors will always be directly underneath you in the personal enrollment tree.

## BLUE DIAMOND LEADERSHIP POOL

We have reserved 1% of total company GV for our elite group of MonaVie Blue and Hawaiian Blue Diamond Executives with at least 200 PV. For each personal enrollment tree leg where there is a qualified Bronze Executive or above, qualified Blue and Hawaiian Blue Diamonds earn units in the Blue Diamond Leadership Pool. The more qualified executive legs you create, the more units you earn in this pool. This reward is paid weekly based on your earned portion.

## BLACK DIAMOND LEADERSHIP POOL

We have reserved 1% of total company GV for our Executive Premier ranks with at least 200 PV. As a qualified Black Diamond or above, you earn units in this pool for each of your personal enrollment tree legs where there is a qualified Diamond Executive or above. The more qualified Diamond Executive legs you create—and the higher Executive Premier rank you achieve—the more units you earn in our Black Diamond Leadership Pool. The 1% total company GV is paid weekly to our qualified Premier Executives, based on their earned portion in this pool.

## MULTIPLE BUSINESS CENTERS

As your MonaVie business grows, you can potentially have a total of four business centers (initial center plus three additional centers), with each potentially earning $10,000 per week in team commissions. You are awarded your second business center at Hawaiian Blue Diamond and your remaining two business centers at Black Diamond. While additional business centers allow you to maximize your income earnings potential, they are not required for you to advance within the

compensation plan. A distributor can reach Crown Black Diamond, the highest rank in MonaVie, by focusing on this or her initial business center.

You must maintain the requirements of a qualified Blue Diamond and be active with 200 PV to earn income on multiple business centers.

3

# BLACK DIAMOND REWARDS

## BLACK DIAMOND

- Earn remaining two business centers (3rd and 4th)
- $1,500 Black Diamond Mercedes Car Allowance*
- 3 units† in the Black Diamond Leadership Pool
- 1 week access to the 3-bedroom MonaVie Chateau Villa at the Zermatt Resort (Midway, Utah)
- Black Diamond ring (men) and pendant (women)



## ROYAL BLACK DIAMOND

- $100,000 travel credits
- 6 units† in the Black Diamond Leadership Pool
- 1 week access to the MonaVie Reef Towers Penthouse (Atlantis Resort, Bahamas)
- MonaVie Day—we fly you and your family to Salt Lake City, Utah, where you will receive the royal treatment!



## PRESIDENTIAL BLACK DIAMOND

- $300,000 travel credits
- 9 units† in the Black Diamond Leadership Pool

## IMPERIAL BLACK DIAMOND

- $600,000 cash/travel credits
- 12 units† in the Black Diamond Leadership Pool



## CROWN BLACK DIAMOND

- $1,000,000 cash/travel credits
- 20 units† in the Black Diamond Leadership Pool

# DISTRIBUTOR ANNUAL REWARD TRIPS

- Ruby Fly-In
- Diamond Destination
- Black Diamond Celebration



* When you first achieve the rank of Black Diamond, you earn an immediate $1,500 allowance from MonaVie to apply toward the MonaVie Mercedes program. After you have received your one-year MonaVie will continue to pay you $1,500 per month for one full year as an allowance for your car. After one year, MonaVie will review your distributorship. You will continue to receive a monthly allowance for the next year and subsequent years based on how many weeks in the previous year you maintained your qualified and active rank of Black Diamond: 40 weeks or plus = $1,500; 30-39 weeks = $1,000; 20-29 weeks = $750; 15-19 weeks = $500. You must be active with at least 200 PV to earn the Black Diamond car allowance.
† For each personal enrollment tree leg where a qualified Diamond or above is found.

# MONAVIE RANK QUALIFICATIONS

| RANKS | QUALIFICATIONS | |
|---|---|---|
| **STAR RANKS** | | |
| STAR | Personally active and qualified (a personally sponsored and active distributor on both your left and right legs)* | |
| STAR 500 | 500 GV in your lesser volume leg during a one week period | Total Weekly Earning Potential $1,000 |
| STAR 1000 | 1,000 GV in your lesser volume leg during a one week period | Total Weekly Earning Potential $1,000 |

| **EXECUTIVE RANKS** | | |
|---|---|---|
| BRONZE | 2,000 GV in your lesser volume leg during a one week period and a minimum of one personal enrollment tree leg that includes a qualified STAR 500 or above | Total Weekly Earning Potential $1,000 |
| SILVER | 3,000 GV in your lesser volume leg during a one week period and a minimum of two personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $1,500 |
| GOLD | 5,000 GV in your lesser volume leg during a one week period and a minimum of three personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $2,500 |

| **EXECUTIVE ELITE RANKS** | | |
|---|---|---|
| RUBY | 10,000 GV<br>Must meet the following requirements for two consecutive weeks: Maintain 10,000 GV in your lesser volume leg and a minimum of four personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $5,000 |
| EMERALD | 15,000 GV<br>Must meet the following requirements for two consecutive weeks: Maintain 15,000 GV in your lesser volume leg and a minimum of five personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $7,500 |
| DIAMOND | 20,000 GV<br>Must meet the following requirements for three consecutive weeks: Maintain 20,000 GV in your lesser volume leg and a minimum of six personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $10,000 |
| BLUE DIAMOND | 25,000 GV<br>Must meet the following requirements for four consecutive weeks: Maintain 25,000 GV in your lesser volume leg and a minimum of seven personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $20,000 |
| HAWAIIAN BLUE DIAMOND† | 75,000 GV<br>Must meet the following requirements for four consecutive weeks: Maintain 75,000 GV in enrollment tree volume with no more than 25,000 GV coming from any single enrollment tree leg and a minimum of seven personal enrollment tree legs that include a qualified STAR 500 or above in each leg | Total Weekly Earning Potential $25,000 |

| **EXECUTIVE PREMIER RANKS†** | | |
|---|---|---|
| BLACK DIAMOND | 150,000 GV for four consecutive weeks in enrollment tree volume with no more than 50,000 GV coming from any single enrollment tree leg | Unlimited Weekly Earning Potential |
| ROYAL BLACK DIAMOND | 300,000 GV for four consecutive weeks in enrollment tree volume with no more than 50,000 GV coming from any single enrollment tree leg | Unlimited Weekly Earning Potential |
| PRESIDENTIAL BLACK DIAMOND | 450,000 GV for four consecutive weeks in enrollment tree volume with no more than 50,000 GV coming from any single enrollment tree leg | Unlimited Weekly Earning Potential |
| IMPERIAL BLACK DIAMOND | 600,000 GV for four consecutive weeks in enrollment tree volume with no more than 50,000 GV coming from any single enrollment tree leg | Unlimited Weekly Earning Potential |
| CROWN BLACK DIAMOND | 1,000,000 GV for four consecutive weeks in enrollment tree volume with no more than 50,000 GV coming from any single enrollment tree leg | Unlimited Weekly Earning Potential |

* Distributors must be personally active and qualified to advance any rank.
† Hawaiian Blue Diamond and Executive Premier Rank distributors must maintain the requirements of a qualified Blue Diamond.

5

# COMPENSATION PLAN Q&A

**1. Does the company guarantee a certain commission payout percentage?**

Yes. Each week the company guarantees that 50% of total GV will be paid to distributors through our compensation plan.

**2. If I go inactive by not ordering products, what happens to my volume and my organization?**

All accumulated group volume will be reset to zero; however, once you reactivate with a product purchase of at least 100 PV, you will once again begin to accumulate group volume as products are purchased in your downline organization.

**3. Why am I considered "active" for four weeks rather than an entire month?**

We pay weekly commissions. A week consists of seven days and runs from Saturday at 12:01 a.m. (MST) to Friday at midnight. Since we pay weekly commissions rather than monthly commissions, our definition of "active" is a four-week rolling period rather than an entire month.

**4. Are all commissions and bonuses paid on a weekly basis?**

Yes.

**5. Once I've earned commissions, when can I expect to be paid?**

The commission week ends on Friday night at exactly midnight (MST). Any earned commissions will be paid 7 days later, which is the Friday after the end of the commission week. However, the first time commissions are earned, we must process your personalized MonaVie cash card, where your commissions are deposited. Anticipate that it will take approximately 7–10 business days after the end of the commission period to receive your card in the mail.

**6. When team commissions are paid, what volume is deducted from my business center?**

Any volume on both your left and right leg that was used to earn team commissions will then be deducted. Any unpaid volume will continue accumulating as long as you remain active.

**7. What is AutoShip?**

AutoShip puts you in a position to maximize your commission choices and take full advantage of the MonaVie compensation plan. This optional program allows you to establish a standing monthly order with MonaVie. It's simple and stress-free. Your product will be delivered to you on a regular basis at the wholesale price. You can put your AutoShip order on hold, change it, or cancel it at any time by calling Distributor Support at 1-866-217-8455 or sending an email to distributorsupport@monavie.com. (Please notify us at least 2 days before your next scheduled AutoShip order for changes to take effect for that AutoShip date.)



# IMPORTANT TERMS

**Volume:** PV is personal volume (personal purchases) and GV is group volume (purchases in your organization). Volume refers to the points assigned to products. For example, a case of MonaVie has 100 points of volume. Commissions are earned on points.

**Active:** To earn commissions you must be active. You become and remain active by purchasing a minimum of 100 PV every four weeks. For example, purchasing one case of MonaVie every four weeks will keep you active.

**Qualified:** You must also be qualified to earn commissions. This means you must have at least one personally sponsored and active distributor on both your left and right legs.

**Organization:** When we refer to your organization, we are referring to all distributors in your downline. Other terms used for this are "tree" and "genealogy."

**Business Center:** Your business center is where you are personally placed within the MonaVie organization. We may also refer to your business center as a position in the organization.

**Personal Enrollment Tree:** This refers to those you have personally sponsored, those they have personally sponsored, and so forth.

All references to income, implied or stated, through the MonaVie Compensation Plan are for illustration purposes only. MonaVie does NOT guarantee any level of income or earnings to any distributor. Earnings from the MonaVie Compensation Plan solely depend on each distributor's skill, ability, and personal qualification.



1  12200 30101  3

©2007, 2008 MonaVie LLC 0308

# MONAVIE INC.
## STATEMENT OF
## POLICIES AND PROCEDURES

United States                                          Effective November 1, 2007

## TABLE OF CONTENTS

SECTION 1 – CORPORATE MISSION STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SECTION 2 – GENERAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.1 – POLICIES AND COMPENSATION PLAN INCORPORATED INTO DISTRIBUTOR AGREEMENT . . . . . . . 4

    2.2 – ADHERENCE TO MONAVIE'S COMPENSATION PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.3 – PURPOSE OF POLICIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.4 – CHANGES TO THE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.5 – DELAYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.6 – POLICIES AND PROVISIONS SEVERABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.7 – WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.8 – CORPORATE TOURS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SECTION 3 – BECOMING A DISTRIBUTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.1 – REQUIREMENTS TO BECOME A DISTRIBUTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.2 – NO PRODUCT PURCHASE REQUIRED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.3 – DISTRIBUTOR BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.4 – TERM AND RENEWAL OF YOUR MONAVIE BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SECTION 4 – INCOME DISCLOSURE POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SECTION 5 – ADVERTISING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    5.1 – ADHERENCE TO THE MONAVIE MARKETING AND COMPENSATION PLAN . . . . . . . . . . . . . . . . 7

    5.2 – INDEPENDENT DISTRIBUTOR-PRODUCED MARKETING MATERIALS . . . . . . . . . . . . . . . . . . . . 7

    5.3 – DISTRIBUTOR WEBSITES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    5.4 – BLOGS, CHAT ROOMS, SOCIAL NETWORKS, ONLINE AUCTIONS, AND OTHER ONLINE FORUMS . 7

    5.5 – DOMAIN NAMES AND EMAIL ADDRESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    5.6 – SALES MEDIUMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    5.7 – ADVERTISED PRICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    5.8 – GENERIC BUSINESS ADVERTISEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    5.9 – MEDIA AND MEDIA INQUIRIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    5.10 – UNSOLICITED EMAIL AND FAX COMMUNICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    5.11 – TELEMARKETING RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    5.12 – UNAUTHORIZED CLAIMS AND ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        5.12.1 – Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        5.12.2 – Product Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    5.13 – TRADE SHOWS, EXPOSITIONS, AND OTHER SALES FORUMS . . . . . . . . . . . . . . . . . . . . . . 10

©2007 MONAVIE INC.

SECTION 6 – A DISTRIBUTOR'S RELATIONSHIP WITH THE COMPANY . . . . . . . . . . . . . . . . . . . . . . . . . 10
   6.1 – BUSINESS ENTITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      6.1.1 – Changes to a Business Entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      6.1.2 – Change of Sponsor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      6.1.3 – Change of Placement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      6.1.4 – Cancellation and Re-application. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   6.2 – CONFLICTS OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      6.2.1 – Nonsolicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      6.2.2 – Sale of Competing Goods or Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      6.2.3 – Distributor Participation in Other Direct Selling Programs . . . . . . . . . . . . . . . . . 11
   6.3 – TARGETING OTHER DIRECT SELLERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   6.4 – DOWNLINE (GENEALOGY) REPORTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   6.5 – CROSS SPONSORING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.6 – GOVERNMENTAL APPROVAL OR ENDORSEMENT . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.7 – HOLDING APPLICATIONS OR ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.8 – IDENTIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.9 – INCOME TAXES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.10 – INDEPENDENT CONTRACTOR STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.11 – INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   6.12 – INTERNATIONAL MARKETING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   6.13 – INVENTORY LOADING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   6.14 – BENEFICIAL INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   6.15 – SUCCESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      6.15.1 – Transfer Upon Death of a Distributor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      6.15.2 – Transfer Upon Incapacitation of a Distributor . . . . . . . . . . . . . . . . . . . . . . . . . 14
   6.16 – SALE, TRANSFER, OR ASSIGNMENT OF A MONAVIE BUSINESS . . . . . . . . . . . . . . 14
   6.17 – ACTIONS OF HOUSEHOLD MEMBERS OR AFFILIATED INDIVIDUALS. . . . . . . . . . . 14
   6.18 – SEPARATION OF A MONAVIE BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
SECTION 7 – RESPONSIBILITIES OF DISTRIBUTORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   7.1 – CHANGE OF ADDRESS, TELEPHONE, AND EMAIL ADDRESSES . . . . . . . . . . . . . . . . 15
   7.2 – SPONSORING DISTRIBUTOR RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      7.2.1 – Initial Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      7.2.2 – Ongoing Training Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   7.3 – NONDISPARAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   7.4 – REPORTING POLICY VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
SECTION 8 – SALES REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   8.1 – PRODUCT SALES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   8.2 – NO TERRITORY RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   8.3 – SALES RECEIPTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   8.4 – PRODUCT PACKAGING AND LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SECTION 9 – AUTOSHIP PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
9.1 – AUTOSHIP CYCLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
9.2 – AUTOSHIP STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
9.3 – AUTOSHIP ENROLLMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SECTION 10 – BONUSES AND COMMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
10.1 – BONUS AND COMMISSION QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
10.2 – ERRORS OR QUESTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.3 – BONUS BUYING PROHIBITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.4 – ADJUSTMENTS TO BONUSES AND COMMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . 17
10.4.1 – Returned Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.5 – REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
SECTION 11 – PRODUCT GUARANTEES, RETURNS, AND INVENTORY REPURCHASE . . . . . . . . . . . . . . . . . . . 17
11.1 – CUSTOMER SATISFACTION GUARANTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
11.2 – RETURN OF INVENTORY AND SALES AIDS BY DISTRIBUTORS UPON CANCELLATION . . . . . . . . . 18
11.2.1 – Local and State Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
11.3 – PROCEDURES FOR ALL RETURNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
11.4 – PRODUCT ABANDONMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
SECTION 12 – DISPUTE RESOLUTION AND DISCIPLINARY PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . 18
12.1 – DISCIPLINARY SANCTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12.2 – GRIEVANCES AND COMPLAINTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.3 – DISTRIBUTOR CONDUCT REVIEW COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.4 – DISTRIBUTOR CONDUCT APPEALS COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.5 – MEDIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.6 – ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.7 – GOVERNING LAW, JURISDICTION, AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
SECTION 13 – PAYMENT AND SHIPPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.1 – RETURNED CHECKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.2 – RESTRICTIONS ON THIRD PARTY USE OF CREDIT CARDS AND CHECKING ACCOUNT ACCESS . . 20
13.3 – SALES TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
SECTION 14 – RECLASSIFICATION AND CANCELLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
14.1 – RECLASSIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
14.2 – CANCELLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
14.3 – NON-RENEWAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
SECTION 15 – DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# SECTION 1 – CORPORATE MISSION STATEMENT

Our mission is to improve lives around the world with advanced formulated health products, rewarding financial opportunities, and strategic charitable initiatives.

## 1.1 CODE OF ETHICS

MonaVie, Inc. ("MonaVie" or the "Company") is a values-based company that prides itself on the quality and character of its Distributors. The following guidelines help ensure a uniform standard of excellence throughout our organization. Every MonaVie Distributor is expected to practice the following ethical behavior when acting in the name of the company:

- I will be respectful of every person I meet while doing MonaVie related business.

- At all times I will conduct myself and my business in an ethical, moral, legal, and financially sound manner.

- I will not engage in activities that would bring disrepute to MonaVie, any MonaVie

  corporate officer or employee, myself, or other Distributors.

- I will not make discouraging or disparaging claims toward other MonaVie Distributors. I will ensure that in all MonaVie business dealings I will refrain from engaging in negative language. I will refrain from making any type of slanderous statements.

- I will be truthful in my representation of MonaVie products by making no diagnostic, therapeutic, curative, or exaggerated claims and by clearly stating all terms of sale. I understand any claim of cure, prevention, mitigation, or treatment or any prescription is strictly forbidden.

- I will provide support and encouragement to my Customers to ensure that their experience with MonaVie is a successful one. I understand that it is important to provide follow-up service and support to my downline.

- I will correctly represent all the bonus/compensation plans available through MonaVie and the income potential represented therein. I understand I may not use my own income as an indication of others' potential success, or use compensation checks as marketing materials. I further understand that I may only disclose my MonaVie income to recruit a potential distributor(s) after I have given a copy of the Income Disclosure Statement to the potential distributor(s). A copy of the Income Disclosure Statement can be obtained upon written request to MonaVie or at www.MonaVie.com/IDS.

- I will abide by all of MonaVie's Policies & Procedures now and as they may be amended in the future.

# SECTION 2 – INTRODUCTION

## 2.1 – POLICIES AND COMPENSATION PLAN INCORPORATED INTO DISTRIBUTOR AGREEMENT

These Policies and Procedures, in its present form and as amended at the sole discretion of MonaVie, are incorporated into and form an integral part of the MonaVie Distributor Agreement. Throughout these Policies, when the term "Agreement" is used, it collectively refers to the MonaVie Distributor Application and Agreement, these Policies and Procedures, and the MonaVie Compensation Plan. These documents are incorporated by reference into the MonaVie Distributor Agreement (all in their current form and as amended by MonaVie). It is the responsibility of each Independent Distributor (hereafter "Distributor") to read, understand, adhere to, and ensure that they are aware of and operating under the most current version of these Policies and Procedures. When sponsoring or enrolling a new Distributor, it is the responsibility of the sponsoring Distributor to ensure that the applicant is provided with, or has online access to the most current version of these Policies and Procedures and the MonaVie Compensation Plan prior to their execution of the Distributor Agreement.

## 2.2 – ADHERENCE TO THE MONAVIE COMPENSATION PLAN

Distributors must adhere to the terms of the MonaVie Compensation Plan as set forth in Official MonaVie Literature. Distributors shall not offer the MonaVie opportunity through, or in combination with, any other system, program, or method of marketing other than that specifically set forth in Official MonaVie Literature. Distributors shall not require or encourage other current or prospective Customers or Distributors to participate in MonaVie in any manner that varies from the program as set forth in Official MonaVie Literature. Distributors shall not require or encourage other current or prospective Customers or Distributors to execute any agreement, contract, or membership, other than those offered by the Company, in order to become a MonaVie Distributor. Similarly, Distributors shall not require or encourage other current or prospective Customers or Distributors to make any purchase from, or payment to, any individual or other entity to participate in the MonaVie Compensation Plan other than those purchases or payments identified as recommended or required in Official MonaVie Literature.

## 2.3 – PURPOSE OF POLICIES

MonaVie is a direct sales company that markets its products through Independent Distributors. It is important to understand that your success and the success of your fellow Distributors depends on the integrity of the men and women who market our products and services. To clearly define the relationship that exists between Distributors and MonaVie, and to explicitly set a standard for acceptable business conduct, MonaVie has established the Agreement.

MonaVie Distributors are required to comply with (1) all of the Terms and Conditions set forth in the Agreement which MonaVie may amend at its sole discretion from time to time and (2) all federal, state, and local laws governing their MonaVie business and their conduct. Because you may be unfamiliar with many of these standards of practice, it is very important that you read and abide by the Agreement. Please review the information in this manual carefully. It explains and governs the relationship between you, as an independent contractor, and the Company. If you have any questions regarding any policy or rule, do not hesitate to contact compliance@monavie.com or seek an answer from your upline.

## 2.4 – CHANGES TO THE AGREEMENT

Because federal, state, and local laws, as well as the business environment, periodically change, MonaVie reserves the right to amend the Agreement and its prices in its sole and absolute discretion. By signing the Distributor Agreement, a Distributor agrees to abide by all amendments or modifications that MonaVie elects to make. Amendments shall be effective upon notice to all Distributors that the Agreement has been modified. Notification of amendments shall be published in official MonaVie materials. The Company shall provide or make available to all Distributors a complete copy of the amended provisions by one or more of the following methods: (1) posting on the Company's official website, (2) electronic mail (email), (3) fax-on-demand, (4) voice mail system broadcast, (5) inclusion in Company periodicals, (6) inclusion in product orders, or (7) special mailings. The continuation of a Distributor's MonaVie business or a Distributor's acceptance of bonuses or commissions constitutes acceptance of any and all amendments.

## 2.5 – DELAYS

MonaVie shall not be responsible for delays or failures in performance of its obligations when performance is made commercially impracticable due to circumstances beyond its reasonable control. This includes, without limitation, strikes, labor difficulties, riot, war, fire, death,

curtailment of a party's source of supply, or government decrees or orders.

## 2.6 – POLICIES AND PROVISIONS SEVERABLE

If any provision of the Agreement, in its current form or as may be amended is found to be invalid or unenforceable for any reason, only the invalid portion(s) of the provision shall be severed and the remaining terms and provisions shall remain in full force and effect. The severed provision, or portion thereof, shall be reformed to reflect the purpose of the provision as closely as possible.

## 2.7 – WAIVER

The Company never gives up its right to insist on compliance with the Agreement and with the applicable laws governing the conduct of a business. No failure of MonaVie to exercise any right or power under the Agreement or to insist upon strict compliance by a Distributor with any obligation or provision of the Agreement, and no custom or practice of the parties at variance with the terms of the Agreement, shall constitute a waiver of MonaVie's right to demand exact compliance with the Agreement. Waiver by MonaVie can be effectuated only in writing by an authorized officer of the Company. MonaVie's waiver of any particular breach by a Distributor shall not affect or impair MonaVie's rights with respect to any subsequent breach, nor shall it affect in any way the rights or obligations of any other Distributor. Nor shall any delay or omission by MonaVie to exercise any right arising from a breach affect or impair MonaVie's rights as to that or any subsequent breach.

The existence of any claim or cause of action of a Distributor against MonaVie shall not constitute a defense to MonaVie's enforcement of any term or provision of the Agreement.

## 2.8 – CORPORATE TOURS

You may visit our corporate owned facilities only at designated times. You must make an appointment in advance to arrange any such visit. At the time of the visit, you will be required to sign in at the front desk immediately after entering the office. A Company employee must accompany you at all times you are in the Company offices.

## SECTION 3 – BECOMING A DISTRIBUTOR

## 3.1 – REQUIREMENTS TO BECOME A DISTRIBUTOR

To become a MonaVie Distributor, each applicant must:

  3.1.1 Be of the age of majority in his or her state of residence;

©2007 MONAVIE INC.

3.1.2 Reside in the United States, U.S. Territories, or a country that MonaVie has officially opened for business;

3.1.3 Have a valid Social Security or Federal Tax ID number on file with the Company (if in the U.S.);

3.1.4 Submit a properly completed Distributor Agreement to MonaVie.

## 3.2 – NO PRODUCT PURCHASE REQUIRED

No person is required to purchase MonaVie products, services or sales aids, to become a Distributor. However, each applicant must purchase a $39.00 Starter Kit. This Kit will include various marketing materials and will include the $20.00 annual membership fee. MonaVie will repurchase resalable kits from any Distributor who terminates their Distributor Agreement pursuant to the terms of Section 14.

## 3.3 – DISTRIBUTOR BENEFITS

Once a Distributor Agreement has been accepted by MonaVie, the benefits of the Compensation Plan and the Distributor Agreement are available to Distributors in good standing. These benefits include the right to:

3.3.1 Sell MonaVie products in accordance with Policies & Procedures;

3.3.2 Participate in the MonaVie Compensation Plan (receive bonuses and commissions, if eligible);

3.3.3 Sponsor other individuals as Customers or Distributors into the MonaVie business and thereby, build a marketing organization and progress through the MonaVie Compensation Plan;

3.3.4 Receive periodic MonaVie literature and other MonaVie communications;

3.3.5 Participate in MonaVie-sponsored support, service, training, motivational and recognition functions (upon payment of appropriate charges, if applicable); and

3.3.6 Participate in promotional and incentive contests and programs sponsored by MonaVie.

## 3.4 – TERM AND RENEWAL OF A MONAVIE BUSINESS

The term of the Distributor Agreement is one year from the date of its acceptance by MonaVie (subject to reclassification for inactivity after six months). Every Distributor Agreement must be renewed each year with an annual renewal fee of $20, which must be paid on or before the anniversary date of the Distributor Agreement. If the renewal fee is not paid within 30 days after the expiration of the current term of the Distributor Agreement, the

Agreement will be canceled and the Distributor will be purged from the system.

MonaVie provides an Automatic Renewal Program ("ARP") for qualifying Distributors who will be enrolled automatically. To qualify for the ARP, a Distributor must have in excess of $20 in commissions owed at the time of renewal. If a qualifying Distributor does not wish to auto-renew their Distributorship, they must employ the available Opt-Out feature. The ARP fee ($20) will be deducted from the Distributor's closest commission check coinciding with their renewal date. Distributors who are not automatically enrolled in ARP may become re-enrolled via the manual re-enrollment process available through the Virtual Office system.

## SECTION 4 – INCOME DISCLOSURE POLICY

MonaVie's corporate ethics compel us to do not merely what is legally required, but rather, to conduct the absolute best business practices. To this end, we have developed the Income Disclosure Statement ("IDS"). The MonaVie IDS is designed to convey truthful, timely, and comprehensive information regarding the income that MonaVie distributors earn. In order to accomplish this objective, a copy of the IDS must be presented to all prospective distributors.

A copy of the IDS must be presented to a prospective distributor (someone who is not a party to a current MonaVie Distributor Agreement) anytime the Compensation Plan is presented or discussed, or any type of income claim or earnings representation is made.

The terms "income claim" and/or "earnings representation" (collectively "income claim") include: (1) statements of average earnings, (2) statements of non-average earnings, (3) statements of earnings ranges, (4) income testimonials, (5) lifestyle claims, and (6) hypothetical claims. Examples of "statements of non-average earnings" include, "Our number one distributor earned XXX dollars last year" or "Our average Black Diamond makes XXX per month." An example of a "statement of earnings ranges" is "The monthly income for Blue Diamonds is XXX on the low end to YYY on the high end."

A lifestyle income claim typically includes statements (or pictures) involving large homes, luxury cars, exotic vacations, or other items suggesting or implying wealth. They also consist of references to the achievement of one's dreams, having everything one always wanted, and are phrased in terms of "opportunity" or "possibility" or "chance." Claims such as "My MonaVie income exceeded my salary after six months in the business," or "Our MonaVie business has allowed my wife to come home and be a full-time mom" also fall within the purview of "lifestyle" claims.

A hypothetical income claim exists when you attempt to explain the operation of the Compensation Plan through the use of a hypothetical example. Certain assumptions are made regarding the: (1) number of distributors sponsored, (2) number of downline distributors, (3) average product volume per distributor, and (4) total organizational volume. Cranking these assumptions through the Compensation Plan yields income figures which constitute income claims.

In any non-public meeting (e.g., a home meeting, one-on-one, regardless of venue) with a prospective distributor or distributors in which the Compensation Plan is discussed or any type of income claim is made, you must provide the prospect(s) with a copy of the IDS. In any meeting that is open to the public in which the Compensation Plan is discussed or any type of income claims is made, you must provide every prospective distributor with a copy of the IDS and you must display at least one (3 x 5 foot posterboard) in the front of the room in reasonably close proximity to the presenter(s). In any meeting in which any type of video display is utilized (e.g., monitor, television, projector, etc.) a slide of the IDS must be displayed continuously throughout the duration of any discussion of the Compensation Plan or the making of an income claim.

Copies of the IDS may be printed or downloaded without charge from the corporate website at www.MonaVie.com/IDS.

Black Diamonds who develop sales aids and tools in which the Compensation Plan or income claims are present must incorporate the IDS into each such sales aid or tool prior to submission to the Company for review.

SECTION 5 – ADVERTISING

5.1 – INTELLECTUAL PROPERTY

MonaVie will not allow the use of its trade names, trademarks, designs, or symbols outside of corporate-produced and -approved sales aids by any person, including MonaVie Distributors, without prior written authorization from MonaVie.

5.2 – INDEPENDENT DISTRIBUTOR-PRODUCED MARKETING MATERIALS

Only Distributors who have achieved the rank of Black Diamond or higher may create and publish their own marketing materials, advertising materials, and/or other sales aids. All items must be submitted and reviewed by MonaVie and must bear the appropriate review seal before being disseminated or displayed. Any modification subsequent to initial approval must also be reviewed by MonaVie and must also bear the appropriate review seal before being disseminated or displayed.

Distributors may not sell independently produced items in any type of package that also contains corporate-produced literature.

Distributors may not produce for sale or distribution any recorded Company events and speeches without written permission from MonaVie. Distributors may also not reproduce for sale or for personal use any recording of Company-produced audio or video tape presentations.

MonaVie further reserves the right to rescind approval for any sales tools, promotional materials, advertisements, or other literature, and Distributors waive all claims for damages or remuneration arising from or relating to such rescission.

5.3 – DISTRIBUTOR WEBSITES

If a Distributor desires to utilize an Internet web page to promote their business, they may do so through MonaVie's official website or through MonaVie approved replicating websites after entering into the Website License Agreement. A copy of the Agreement can be obtained upon written request to compliance@monavie.com. Alternatively, Distributors who have achieved the rank of Black Diamond may develop their own web pages. However, any Black Diamond who does so: (a) must use only text found on the Company's official website; (b) may not supplement the content of their website with text from any source other than the Company; (c) must register their site(s) with the Compliance department and receive written permission from Compliance prior to the site's public availability. After initial approval to the website is obtained, the Distributor may not change or modify its website without the express written consent of the Company. Failure to comply may result in disciplinary action up to and including termination of a Distributorship.

5.4 – BLOGS, CHAT ROOMS, SOCIAL NETWORKS, ONLINE AUCTIONS, AND OTHER ONLINE FORUMS

With the exception of the websites allowed by Section 5.3, Distributors shall not use any other website, including but not limited to, online blogs, chat rooms, social networks, online auction sites, video websites, or any other online forum to market, sell, advertise, promote, or discuss MonaVie's products or services, or the MonaVie opportunity.

5.5 – DOMAIN NAMES AND EMAIL ADDRESSES

Distributors may not use or attempt to register or sell any of MonaVie's trade names, trademarks, service names, service marks, product names, or any derivative thereof, for any internet domain name or email address.

## 5.6 – SALES MEDIUMS

MonaVie products may not be sold or promoted through catalogues or other mass sales mediums, such as info-mercials, television, radio, or other related sales mediums.

MonaVie products may not be sold or promoted through retail establishments. You may, however, sell MonaVie sales aids and products through service establishments. These service establishments must require a membership and/or appointment, and the services performed must be health and wellness related.

Only MonaVie-produced or -approved literature, ban-ners, or signage may be displayed on a shelf, counter, or wall. These signage items must not be visible from the outside of the establishment.

## 5.7 – ADVERTISED PRICE

You may not advertise any MonaVie products at a price LESS than the highest company published, established retail price of ONE bottle or ONE case of the MonaVie product plus shipping and applicable taxes. No two-case bulk wholesale price advertising is allowed. No special enticement advertising is allowed. This includes but is not limited to offers of free membership, free shipping, or other such offers that grant advantages beyond those available through the Company.

## 5.8 – GENERIC BUSINESS ADVERTISEMENTS

If you advertise via newspaper or other advertising ven-ues, the following rules apply:

*   No advertisement may imply that a job, position, sal-ary, or any type of employment is allowed.

*   No advertisement may promote, represent, or imply salaried positions, management positions, hourly wages, full or part-time employment, or guaranteed incomes. The MonaVie opportunity is not a job, and may not be presented as such. Terms such as "man-ager trainee," "management positions available," "travel provided," "call for interview," "positions available," "now hiring," and other misleading state-ments are not allowed.

*   No specific income can be promised or implied, and any references to compensation must use the word "commissions" to indicate the independent contrac-tor status of distributors.

*   Advertisements may not contain references to MonaVie or its products.

*   You may not use any of MonaVie's trademarks or trade-names.

Any requests for variances from the above rules must be submitted to MonaVie and approved in writing

prior to publication. Please direct any inquiries to compliance@monavie.com, or by fax to the attention of the Compliance department at (801) 748-3200.

## 5.9 – MEDIA AND MEDIA INQUIRIES

Distributors must not initiate any interaction with the media or attempt to respond to media inquiries regard-ing MonaVie, its products or services, or their inde-pendent MonaVie business. All inquiries by any type of media must be immediately referred to MonaVie's Com-pliance department. This policy is designed to ensure that accurate and consistent information is provided to the public, as well as a proper public image.

## 5.10 – UNSOLICITED EMAIL AND FAX COMMUNICA-TION

MonaVie does not permit Distributors to send unsolicited emails unless such emails strictly comply with applicable laws and regulations, including, without limitation, the federal CAN SPAM Act. Any email sent by a Distributor that promotes MonaVie, the MonaVie opportunity, or MonaVie products and services, must comply with the following:

*   There must be a functioning return email address to the sender.

*   There must be a notice in the email that advises the recipient that they may reply to the email, via the functioning return email address, to request that future email solicitations or correspondence not be sent to him or her (a functioning "opt-out" notice).

*   The email must include the Distributor's physical mailing address.

*   The email must clearly and conspicuously disclose that the message is an advertisement or solicitation.

*   The use of deceptive subject lines and/or false header information is prohibited.

*   All opt-out requests, whether received by email or regular mail, must be honored. If a Distribu-tor receives an opt-out request from a recipient of an email, the Distributor must forward the opt-out request to the Company.

MonaVie may periodically send commercial emails on behalf of Distributors. By entering into the Distributor Agreement, Distributor agrees that the Company may send such emails and that the Distributor's physical and email addresses will be included in such emails as outlined above. Distributors shall honor opt-out requests generated as a result of such emails sent by the Company.

Except as provided in this section, Distributors may not use or transmit unsolicited faxes or use an automatic

telephone dialing system relative to the operation of their MonaVie businesses.

## 5.11 – TELEMARKETING RESTRICTIONS

The Federal Trade Commission and the Federal Communications Commission each have laws that restrict telemarketing practices. Both federal agencies (as well as a number of states) have "do not call" regulations as part of their telemarketing laws. While you may not consider yourself a "telemarketer" in the traditional sense of the word, these regulations broadly define "telemarketer" and "telemarketing" so that your inadvertent action of calling someone whose telephone number is listed on the federal "do not call" registry could cause you to violate the law. Moreover, these regulations must not be taken lightly, as they carry significant penalties (up to $11,000.00 per violation).

Therefore, Distributors must not engage in telemarketing relative to the operation of their MonaVie businesses. The term "telemarketing" means the placing of one or more telephone calls to an individual or entity to induce the purchase of a MonaVie product or service, or to recruit them for the MonaVie opportunity. "Cold calls" made to prospective Customers or Distributors that promote either MonaVie's products or services of the MonaVie opportunity constitute telemarketing and are prohibited.

Notwithstanding the foregoing, a Distributor may place telephone call(s) to a prospective Customer or Distributor (a "prospect") under the following limited situations:

a)  If the Distributor has an established business relationship with the prospect. An "established business relationship" is a relationship between a Distributor and a prospect based on:

- The prospect's purchase, rental, or lease of goods or services from the Distributor within the eighteen (18) months immediately preceding the date of a telephone call to induce the prospect's purchase of a product or services; or

- A financial transaction between the prospect and the Distributor within the eighteen (18) months immediately preceding the date of such a call.

b)  The prospect's personal inquiry or application regarding a product or service offered by the Distributor within the three (3) months immediately preceding the date of such a call.

c)  If the Distributor receives written and signed permission from the prospect authorizing the Distributor to call. The authorization must specify the telephone number(s) which the Distributor is authorized to call.

d)  Distributors may call family members, personal friends, and acquaintances. An "acquaintance" is someone with whom a Distributor has at least a recent first-hand relationship (i.e., the Distributor recently personally met him or her). Bear in mind, however, that if a Distributor makes a habit of "card collecting" from everyone he or she meets and subsequently calling them, the FTC may consider this a form of telemarketing that is not subject to this exemption. Thus, if Distributors engage in calling "acquaintances," the Distributor must make such calls on an occasional basis only and not as a routine practice.

In addition, Distributors shall not use automatic telephone dialing systems relative to the operation of their MonaVie businesses. The term "automatic telephone dialing system" means equipment that has the capacity to: (a) store or produce telephone numbers to be called, using a random or sequential number generator, and (b) to dial such numbers.

## 5.12 – UNAUTHORIZED CLAIMS AND ACTIONS

### 5.12.1 Indemnification

A Distributor is fully responsible for all of their verbal and written statements made regarding MonaVie products, services, and the Marketing and Compensation Plan which are not expressly contained in official MonaVie materials. Distributors agree to indemnify MonaVie and MonaVie's directors, officers, employees, and agents, and hold them harmless from any and all liability including judgments, civil penalties, refunds, attorney fees, court costs, or lost business incurred by MonaVie as a result of the Distributor's unauthorized representations or actions. This provision shall survive the termination of the Distributor Agreement.

### 5.12.2 Product Claims

No claims (which include personal testimonials) as to therapeutic, curative, or beneficial properties of any products offered by MonaVie may be made except those contained in Official MonaVie Literature. In particular, no Distributor may make any claim that MonaVie products are useful in the cure, treatment, diagnosis, mitigation, or prevention of any diseases. Such statements can be perceived as medical or drug claims. Not only do such claims violate MonaVie policies, but they potentially violate federal and state laws and regulations, including the federal Food, Drug, and Cosmetic Act and Federal Trade Commission Act.

## 5.13 – TRADE SHOWS, EXPOSITIONS, AND OTHER SALES FORUMS

MonaVie provides a Trade Show Request Form in the Distributor's Virtual Office, or upon request through Distributor Support. Distributors may display and/or sell ONLY MonaVie products at trade shows and professional expositions, with prior written approval from Compliance. Requests are approved on a first-submitted, first-served basis, and a maximum of one representation per event is allowed. Only one event per Distributor at a time is permitted. At the completion of each event, an additional request may be made.

MonaVie further reserves the right to refuse authorization to participate at any function which it does not deem a suitable forum for the promotion of its products or the MonaVie opportunity.

Approval will not be given for swap meets, garage sales, flea markets, or farmer's markets as these events are not conducive to the professional image MonaVie wishes to portray.

## SECTION 6 – A DISTRIBUTOR'S RELATIONSHIP WITH THE COMPANY

## 6.1 – BUSINESS ENTITIES

A corporation, partnership, limited liability company, or trust (collectively referred to in this section as a "Business Entity") may apply to be a MonaVie Distributor by submitting its Certificate of Good Standing (for corporations and limited liability companies), Partnership Agreement, or trust documents (these documents are collectively referred to as the "Entity Documents") to MonaVie, along with a properly completed Distributor Agreement. A MonaVie business may change its status under the same sponsor from an individual to a partnership, corporation or trust, or from one type of entity to another. There is a $25.00 fee for each change requested, which must be included with a written request and completed Distributor Agreement. The Distributor Agreement form must be signed by all of the shareholders, partners, or trustees. Members of the entity are jointly and severally liable for any indebtedness or other obligation to MonaVie.

To prevent the circumvention of Section 6.16 (regarding transfers and assignments of a MonaVie business), if an additional partner, shareholder, member, or other business entity affiliate is added to a business entity, the original applicant must remain as a party to the original Distributor Agreement. If the original Distributor wants to terminate their relationship with the Company, they must transfer or assign their business in accordance with Section 6.16. If this process is not followed, the business shall be canceled upon the withdrawal of the original

Distributor. All bonus and commission checks will be sent to the address of record of the original Distributor. Please note that the modifications permitted within the scope of this paragraph do not include a change of sponsorship. Changes of sponsorship are addressed in Section 6.1.2 below. There is a $25.00 fee for each change requested, which must be included with the written request and the completed Distributor Agreement. MonaVie may, at its discretion, require notarized documents before implementing any changes to a MonaVie business. Please allow thirty (30) days after the receipt of the request by MonaVie for processing.

### 6.1.1 Changes to a Business Entity

Each Distributor must immediately notify MonaVie of any changes to the type of business entity they utilize in operating their MonaVie business, and the addition or removal of business associates.

### 6.1.2 Change of Sponsor

To protect the integrity of all marketing organizations and safeguard the hard work of all Distributors, MonaVie rarely allows changes in sponsorship, with the rare exception of direct line changes (meaning placement is not affected). A direct line change request must be made by submitting a completed Sponsor Change Request Form within a 7 day period from the date of enrollment, and must come from the current listed sponsor.

### 6.1.3 Change of Placement

A request for change of placement must be submitted within 7 days of the date of enrollment and must be requested by the current listed sponsor. A Distributor can only be moved inside of the same sponsor's organization. If approved, a Distributor is placed in the first available open bottom position on the date that the change is made. Distributors who have earned commissions or achieved rank are not eligible for placement changes.

Please note that decisions made for any change request (sponsor or placement) are at the sole discretion of MonaVie.

### 6.1.4 Cancellation and Re-application

A Distributor may legitimately change organizations by voluntarily cancelling their MonaVie business and remaining inactive (i.e., no purchases of MonaVie products for resale, no sales of MonaVie products, no sponsoring, no attendance at any MonaVie functions, participation in any other form of Distributor activity, or operation of any other MonaVie business)

for six (6) full consecutive calendar months. Following the six-month period of inactivity, the former Distributor may reapply under a new sponsor, but relinquishes all rights held by the original Distributorship (i.e., downline, commissions, etc.).

## 6.2 – CONFLICTS OF INTEREST

### 6.2.1 Nonsolicitation

MonaVie Distributors are free to participate in other multilevel or network marketing business ventures or marketing opportunities (collectively "Network Marketing"). However, during the term of this Agreement, Distributors may not directly or indirectly recruit other MonaVie Distributors or Customers other than those they have personally sponsored for any other Network Marketing business.

Following the cancellation of a Distributor Agreement, and for a period of six calendar months thereafter, with the exception of a Distributor who is personally sponsored by the former Distributor, a former Distributor may not recruit any MonaVie Distributor or Customer for another Network Marketing business. Distributors and the Company recognize that because network marketing is conducted through networks of independent contractors dispersed across the entire United States and internationally, and business is commonly conducted via the internet and telephone, an effort to narrowly limit the geographic scope of this non-solicitation provision would render it wholly ineffective. Therefore, Distributors and MonaVie agree that this non-solicitation provision shall apply to all markets in which MonaVie conducts business.

### 6.2.2 Sale of Competing Goods or Services

Distributors must not sell, or attempt to sell, any competing non-MonaVie programs, products, or services to MonaVie Customers or Distributors. Any program, product, service, or direct selling opportunity in the same generic categories as MonaVie products is deemed to be competing, regardless of differences in cost, quality or other distinguishing factors.

### 6.2.3 Distributor Participation in Other Direct Selling Programs

If a Distributor is engaged in other non-MonaVie direct selling programs, it is the responsibility of the Distributor to ensure that their MonaVie business is operated entirely separate and apart from any other program. To this end, the following must be adhered to:

- Distributors shall not display MonaVie promotional material, sales aids, or products with, or in the same location as, any non-MonaVie promotional material or sales aids, or products.

- Distributors shall not offer the MonaVie opportunity or products to prospective or existing Customers or Distributors in conjunction with any non-MonaVie program, opportunity, product, or service.

- Distributors may not offer any non-MonaVie opportunity, products, services, or opportunity at any MonaVie-related meeting, seminar or convention, or within two hours and a five mile radius of the MonaVie event. If the MonaVie meeting is held telephonically or on the internet, any non-MonaVie meeting must be at least two hours before or after the MonaVie meeting, and on a different conference telephone number or internet web address from the MonaVie meeting.

## 6.3 – TARGETING OTHER DIRECT SELLERS

Should Distributors engage in solicitation and/or enticement of members of another direct sales company to sell or distribute MonaVie products, they bear the risk of being sued by the other direct sales company. If any lawsuit, arbitration, or mediation is brought against a Distributor alleging that they engaged in inappropriate recruiting activity of its sales force or Customers, MonaVie will not pay any of Distributor's defense costs or legal fees, nor will MonaVie indemnify the Distributor for any judgment, award, or settlement.

## 6.4 – DOWNLINE (GENEALOGY) REPORTS

Downline Activity Reports are available for Distributor access and viewing through the Distributor's Virtual Office. Distributor access to their Downline Reports is password protected. All Downline Reports and the information contained therein are confidential and constitute proprietary information and business trade secrets belonging to MonaVie. Downline Reports are provided to Distributors in strictest confidence and are made available to Distributors for the sole purpose of assisting Distributors in working with their respective Downline Organizations in the development of their MonaVie business. Distributors should use their Downline Reports to assist, motivate, and train their downline Distributors. The Distributor and MonaVie agree that, but for this agreement of confidentiality and nondisclosure, MonaVie would not provide Downline Reports to the Distributor. A Distributor shall not, on their own behalf, or on behalf of any other person, partnership, association, corporation or other entity:

©2007 MONAVIE INC.

6.4.1 Directly or indirectly disclose any information contained in any Downline Activity Report to any third party;

6.4.2 Directly or indirectly disclose the password or other access code to their Downline Activity Report;

6.4.3 Use the information to compete with MonaVie or for any purpose other than promoting their MonaVie business;

6.4.4 Recruit or solicit any Distributor or Customer of MonaVie listed on any report, or in any manner attempt to influence or induce any Distributor or Preferred Customer of MonaVie to alter their business relationship with MonaVie.

Upon demand by the Company, any current or former Distributor will return the original, and all copies of, Downline Activity Reports to the Company.

## 6.5 – CROSS SPONSORING

Actual or attempted cross sponsoring is strictly prohibited. "Cross sponsoring" is defined as the enrollment of an individual who or entity that already has a current Customer or Distributor Agreement on file with MonaVie, or who has had such an agreement within the preceding six calendar months, within a different line of sponsorship. The use of a spouse's or relative's name, trade names, DBAs, assumed names, corporations, partnerships, trusts, federal ID numbers, or fictitious ID numbers to circumvent this policy is prohibited. Distributors shall not demean, discredit or defame other MonaVie Distributors in an attempt to entice another Distributor to become part of the first Distributor's marketing organization. This policy shall not prohibit the transfer of a MonaVie business in accordance with Section 6.16.

If Cross Sponsoring is discovered, it must be brought to the Company's attention immediately. MonaVie may take disciplinary action against the Distributor that changed organizations and/or those Distributors who encouraged or participated in the Cross Sponsoring. MonaVie may also move all or part of the offending Distributor's downline to their original downline organization if the Company deems it equitable and feasible to do so. However, MonaVie is under no obligation to move the Cross Sponsored Distributor's downline organization, and the ultimate disposition of the organization remains within the sole discretion of MonaVie. Distributors waive all claims and causes of action against MonaVie arising from or relating to the disposition of the Cross Sponsored Distributor's downline organization.

## 6.6 – GOVERNMENTAL APPROVAL OR ENDORSEMENT

Neither federal nor state regulatory agencies or officials approve or endorse any direct selling or network marketing companies or programs. Therefore, Distributors shall not represent or imply that MonaVie or its Marketing and Compensation Plan have been "approved," "endorsed," or otherwise sanctioned by any government agency.

## 6.7 – HOLDING APPLICATIONS OR ORDERS

All Distributor Agreements and product orders must be sent to MonaVie within 72 hours from the time they are signed by a Distributor or placed by a Customer, respectively.

## 6.8 – IDENTIFICATION

All Distributors are required to provide their Social Security Number, Federal Employer Identification Number, or their Government Issued ID Number to MonaVie either on the Distributor Agreement or at the company's request. Upon enrollment, the Company will provide a unique Distributor Identification Number to the Distributor by which they will be identified. This number will be used to place orders and track commissions and bonuses.

## 6.9 – INCOME TAXES

Each Distributor is responsible for paying local, state/provincial, and federal taxes on any income generated as an Independent Distributor. If a MonaVie business is tax exempt, the Federal tax identification number must be provided to MonaVie. Every year, MonaVie will provide an IRS Form 1099 MISC (Non-employee Compensation) earnings statement to each U.S. resident who: 1) Had earnings of over $600 in the previous calendar year or 2) Made purchases during the previous calendar year in excess of $5,000.

## 6.10 – INDEPENDENT CONTRACTOR STATUS

You are an independent contractor. You are not an agent, employee, partner, or joint venture with the Company. You may not represent yourself as anything other than an Independent Distributor. You have no authority to bind MonaVie to any obligation. You are responsible for paying your own self-employment taxes, federal income taxes and other taxes required by law. You must obey any federal, state, and local laws, as well as Company rules and regulations pertaining to your independent MonaVie Distributorship or the acquisition, receipt, holding, selling, distributing or advertising of MonaVie's products or opportunity.

6.10.1 Distributors may not answer the telephone by saying "MonaVie," "MonaVie Incorporated," or by any other manner that would lead the caller to believe that they have reached MonaVie's corporate offices.

6.10.2 A Distributor may only represent that he/she is a MonaVie Independent Distributor. Therefore, all correspondence and business cards relating to or in connection with a Distributor's MonaVie business shall contain the Distributor's name followed by the term "Independent Distributor."

6.10.3 Indemnity: You agree to indemnify and hold MonaVie, its officers, agents, directors, and employees harmless from any claim, damage, liability, or loss arising out of your activities.

## 6.11 – INSURANCE

MonaVie does not extend coverage under any of its policies to Distributors. Contact your independent insurance agent to ascertain that your business and associated property are properly protected.

## 6.12 – INTERNATIONAL MARKETING

Because of critical legal and tax considerations, MonaVie must limit the resale of MonaVie products and the presentation of the MonaVie business to prospective Customers and Distributors located within the United States and U.S. Territories and those other countries that the Company has officially opened for business. Conducting meetings, promoting the MonaVie financial opportunity, or gifting/distributing product in an unopened country or market is strictly prohibited.

## 6.13 – INVENTORY LOADING

The MonaVie program is built on retail sales to the ultimate consumer. MonaVie encourages its Distributors to only purchase inventory that they and their family will personally consume, will be used as a sales tool, or will be resold to others for their ultimate consumption.

6.13.1 The 70% Rule

Each MonaVie Distributor commits to personally use, sell, or use in business building at least 70% of every order placed with the Company prior to placing another order, and must be able to certify to such if demanded by the Company or by any regulatory agency. No bonuses, commissions, or other compensation may be paid to any Distributor unless it is based on the sale of MonaVie products to end users. Purchasing product solely for the purpose of collecting bonuses or achieving rank is prohibited. MonaVie retains the right to limit the amount of purchases you may make if, in our sole judgment, we believe those purchases are being made solely for qualification purposes instead of for consumption or resale.

In addition, no person is permitted to make a personal order in another Distributor's business center

without prior written permission from the Distributor; this written permission must be on file with MonaVie. The Company reserves the right to restrict or deduct the points and commissions paid, based on sales, in violation of this section from all Distributors who earned such commissions. The deduction of points and commissions will occur in the month in which the sales in question occur, and continue every pay period thereafter until all points and commissions are recovered from the Distributors who received compensation from such sales.

## 6.14 – BENEFICIAL INTEREST

A Distributor may operate or have an ownership interest, legal or equitable, as a sole proprietorship, partner, shareholder, trustee, or beneficiary, in only one MonaVie business. No individual may have, operate, or receive compensation from more than one MonaVie business. Individuals of the same family unit may not enter into or have an interest in more than one MonaVie business. A "family unit" is defined as spouses and dependent children living or doing business at the same address.

In order to maintain the integrity of the MonaVie Compensation Plan, husbands and wives or common-law couples (collectively "spouses") who wish to become MonaVie Distributors must be jointly sponsored as one MonaVie business. Spouses, regardless of whether one or both are signatories to the Distributor Agreement, may not own or operate any other MonaVie business, either individually or jointly, nor may they participate directly or indirectly (as a shareholder, partner, trustee, trust beneficiary, or any other legal or equitable ownership) in the ownership or management of another MonaVie business in any form.

An exception to the one business per Distributor rule will be considered on a case by case basis if two Distributors marry or in cases of a Distributor receiving an interest in another business through inheritance. Requests for exceptions to policy must be submitted in writing to the Compliance department by email at compliance@monavie.com or by fax at 801-748-3200.

## 6.15 – SUCCESSION

Upon the death or incapacitation of a Distributor, their business may be passed to a designated heir(s). Appropriate legal documentation must be submitted to the Company to ensure the transfer is proper. Whenever a MonaVie business is transferred by a will or other testamentary process, the beneficiary acquires the right to collect all bonuses and commissions of the deceased Distributor's marketing organization provided the following qualifications are met. The successor(s) must:

• Execute a Distributor Agreement;

- Comply with terms and provisions of the Agreement;
- Meet all of the qualifications for the deceased Distributor's rank/status;
- Provide MonaVie with an "address of record" to which all bonus and commission checks will be sent. Bonus and commission checks of a MonaVie business transferred pursuant to this section will be paid in a single check jointly to the successor(s).
- Form a business entity and acquire a federal Taxpayer Identification Number, if the business is bequeathed to joint successors. MonaVie will issue all bonus and commission checks and one 1099 to the business entity.

### 6.15.1 Transfer Upon Death of a Distributor

To effect a testamentary transfer of a MonaVie business, the successor must provide the following to MonaVie: (1) an original death certificate, (2) a notarized copy of the will or other instrument establishing the successor's right to the MonaVie business, and (3) a completed and executed Distributor Agreement. If the Successor is already a MonaVie Distributor, the Company may grant exception to the One Distributor per Household rule upon written request from the Successor.

### 6.15.2 Transfer Upon Incapacitation of a Distributor

To effectuate a transfer of a MonaVie business because of incapacity, the successor must provide the following to MonaVie: (1) a notarized copy of an appointment as trustee, (2) a notarized copy of the trust document or other documentation establishing the trustee's right to administer the MonaVie business, and (3) a completed Distributor Agreement executed by the trustee.

### 6.16 – Sale, Transfer, or Assignment of MonaVie Business

Although a MonaVie business is a privately owned, independently operated business, the sale, transfer or assignment of a MonaVie business is subject to certain limitations. If a Distributor wishes to sell their MonaVie business, the following criteria must be met:

6.16.1 The Distributor must have achieved the rank of Ruby;

6.16.2 Protection of the existing line of sponsorship must always be maintained so that the MonaVie business continues to be operated in that line of sponsorship;

6.16.3 The buyer or transferee must become a qualified MonaVie Distributor. If the buyer is an active MonaVie Distributor, they must first terminate their MonaVie business and wait six calendar months before acquiring any interest in the new MonaVie business;

6.16.4 Before the sale, transfer, or assignment can be finalized and approved by MonaVie, any debt obligations the selling Distributor has with MonaVie must be satisfied; and

6.16.5 The selling Distributor must be in good standing and not in violation of any of the terms of the Agreement in order to be eligible to sell, transfer, or assign a MonaVie business.

Prior to selling a MonaVie business, the selling Distributor must notify MonaVie's Compliance department of their intent to sell the MonaVie business. No changes in line of sponsorship can result from the sale or transfer of a MonaVie business. A Distributor may not sell, transfer, or assign portions of their Distributorship or business—a Distributorship must be sold in its entirety.

### 6.17 – ACTIONS OF HOUSEHOLD MEMBERS OR AFFILIATED INDIVIDUALS

If any member of a Distributor's immediate household engages in any activity which, if performed by the Distributor, would violate any provision of the Agreement, such activity will be deemed a violation by the Distributor and MonaVie may take disciplinary action pursuant to these policies and procedures against the Distributor. Similarly, if any individual associated in any way with a corporation, partnership, trust, or other entity (collectively "affiliated individual") violates the Agreement, such action(s) will be deemed a violation by the entity and MonaVie may take disciplinary action against the entity.

All applicants listed on a Distributor Agreement are responsible for the activities associated with the Distributorship.

### 6.18 – SEPARATION OF A MONAVIE BUSINESS

MonaVie Distributors sometimes operate their MonaVie businesses as husband-wife partnerships, regular partnerships, corporations, or trusts. At such time as a marriage may end in divorce or a corporation, partnership, or trust (the latter three entities are collectively referred to herein as "entities") may dissolve, arrangements must be made to assure that any separation or division of the business is accomplished so as not to adversely affect the interests and income of other businesses up or down the line of sponsorship. If the separating parties fail to provide for the best interests of other Distributors and the Company in a timely fashion, MonaVie will involuntarily terminate the Distributor Agreement.

During the divorce or entity dissolution process, the parties must adopt one of the following methods of operation:

6.18.1 One of the parties may, with consent of the other(s), operate the MonaVie business pursuant to an assignment in writing whereby the relinquishing spouse, shareholders, partners, or trustees authorize MonaVie to deal directly and solely with the other spouse or non-relinquishing shareholder, partner, or trustee.

6.18.2 The parties may continue to operate the MonaVie business jointly on a "business-as-usual" basis, whereupon all compensation paid by MonaVie will be paid according to the status quo as it existed prior to the divorce filing or dissolution proceedings. This is the default procedure if the parties do not agree on the format set forth above.

The Company will never remove a party to a Distributorship from a Distributor account without that party's written permission and signature. Under no circumstances will the downline organization of divorcing spouses or a dissolving business entity be divided. Under no circumstances will MonaVie split commission and bonus checks between divorcing spouses or members of dissolving entities. MonaVie will recognize only one downline organization and will issue only one commission check per MonaVie business per commission cycle. Commission checks shall always be issued to the same individual or entity. In the event that parties to a divorce or dissolution proceeding are unable to resolve a dispute over the disposition of commissions and ownership of the business in a timely fashion as determined by the Company, the Distributor Agreement shall be involuntarily canceled.

If a former spouse has completely relinquished all rights in the original MonaVie business pursuant to a divorce, they are thereafter free to enroll under any sponsor of their choosing without waiting six calendar months. In the case of business entity dissolutions, the former partner, shareholder, member, or other entity affiliate who retains no interest in the business must wait six calendar months from the date of the final dissolution before re-enrolling as a Distributor. In either case, however, the former spouse or business affiliate shall have no rights to any Distributors in their former organization or to any former retail customer. They must develop the new business in the same manner as would any other new Distributor.

## SECTION 7 – RESPONSIBILITIES OF DISTRIBUTORS

### 7.1 – CHANGE OF ADDRESS, TELEPHONE, AND EMAIL ADDRESSES

To ensure timely delivery of products, support materials, and commission checks, it is critically important that the MonaVie's files are current. Street addresses are required for shipping since UPS cannot deliver to a post office box. Distributors planning to move or change their email address must submit an amended Distributor Agreement complete with the new information.

### 7.2 – SPONSORING DISTRIBUTOR RESPONSIBILITIES

#### 7.2.1 Initial Training

Any Distributor who sponsors another Distributor into MonaVie must perform a bona fide assistance and training function to ensure that their downline is properly operating their MonaVie business. Distributors must provide the most current version of the Policies and Procedures, the Income Disclosure Statement, and Compensation Plan to individuals whom they are sponsoring to become Distributors before the applicant signs a Distributor Agreement. Additional copies of the Policies and Procedures and the Income Disclosure Statement can be downloaded from MonaVie's website.

A sponsoring Distributor must require each prospective Distributor to personally complete the enrollment forms—whether electronically or on paper.

Upline Distributors are also responsible to motivate and train new Distributors in MonaVie product knowledge, effective sales techniques, the MonaVie Marketing and Compensation Plan, and compliance with Company Policies and Procedures.

#### 7.2.2 Ongoing Training Responsibilities

Distributors must monitor the Distributors in their Downline Organizations to ensure that downline Distributors do not make improper product or business claims, or engage in any illegal or inappropriate conduct. Upon request, every Distributor should be able to provide documented evidence to MonaVie of their ongoing fulfillment of the responsibilities of a Sponsor.

Regardless of their level of achievement, Distributors have an ongoing obligation to continue to personally promote sales through the generation of new Customers and through servicing their existing Customers.

### 7.3 – NONDISPARAGEMENT

Distributors must not disparage, demean, or make negative remarks about MonaVie, other MonaVie Distributors, MonaVie's products, the Compensation plan, or MonaVie's owners, board members, directors, officers, or employees.

### 7.4 – REPORTING POLICY VIOLATIONS

Distributors observing a Policy violation by another

©2007 MONAVIE INC.

Distributor should submit a written report of the violation directly to the attention of the MonaVie Compliance department, complete with all supporting evidence and pertinent information. It is important to understand that information that is submitted will be kept confidential.

## SECTION 8 – SALES REQUIREMENTS

### 8.1 – PRODUCT SALES

The MonaVie Marketing and Compensation Plan is based on the sale of MonaVie products and services to end consumers. Distributors must fulfill personal and Downline Organization retail sales requirements (as well as meet other responsibilities set forth in the Agreement) to be eligible for bonuses, commissions, and advancement to higher levels of achievement. The following sales requirements must be satisfied for Distributors to be eligible for commissions:

8.1.1 Distributors must satisfy the Personal Sales Volume and Group Sales Volume requirements to fulfill the requirements associated with their rank as specified in the MonaVie Marketing and Compensation Plan.

8.1.2 At least 70% of a Distributor's total personal sales volume must be sold to retail customers or personally consumed before any new orders may be placed with the Company.

8.1.3 Distributors must develop or service at least five Customers each month.

### 8.2 – NO TERRITORY RESTRICTIONS

There are no exclusive territories granted to anyone. No franchise fees are required.

### 8.3 – SALES RECEIPTS

All Distributors must provide their retail customers with two copies of an official MonaVie sales receipt at the time of the sale. These receipts set forth the Customer Satisfaction Guarantee as well as any consumer protection rights afforded by federal or state law. Distributors must verbally inform the buyer of their cancellation rights. Distributors must maintain all retail sales receipts for a period of two years and furnish them to MonaVie at the Company's request. MonaVie will maintain documentation for purchases made directly from the Company.

### 8.4 – PRODUCT PACKAGING AND LIABILITY

Under no circumstances may you print your own labels or repackage MonaVie's products. Products are to be sold in their original packaging only.

Subject to the limitations set forth in this provision, the Company shall defend Distributors from claims made by third-party customers alleging injury from use of a product or injury due to a defective product. The Distributor must promptly notify the Company in writing of any such claim, no later than ten (10) days from the date of the third-party claimant's letter alleging injury; failure to so notify the Company shall alleviate any obligation of the Company respecting such claim. The Distributor must allow the Company to assume the sole and absolute discretion respecting the defense of the claim, and use and choice of counsel as a condition to the Company's obligation to defend Distributor.

## SECTION 9 – AUTOSHIP PROGRAM

### 9.1 – AUTOSHIP CYCLE

By enrolling in AutoShip, you can ensure that you have 1) an adequate inventory with which you can service retail customers, 2) adequate product for demonstrations and sampling purposes, and 3) adequate inventory for personal use. The AutoShip program eliminates the inconvenience of placing monthly orders manually.

AutoShip orders run on a 28-day cycle. Your order will not be processed on the same day every month, but rather on a sliding calendar. A calendar is provided in every Distributor's Virtual Office so you can track when your next AutoShip is scheduled to run. The date of your AutoShip can be changed in the Virtual Office or by calling MonaVie Distributor Support.

### 9.2 – AUTOSHIP STATUS

You may deactivate or reactivate your AutoShip order at any time.

### 9.3 – AUTOSHIP ENROLLMENT

MonaVie recommends that each applicant personally enroll in the AutoShip Program. Sponsors may not set up an AutoShip order on behalf of their new personally sponsored Distributors without written permission from the enrolling Distributor. Permission must be on file with the Compliance department prior to enrollment.

## SECTION 10 – BONUSES AND COMMISSIONS

### 10.1 – BONUS AND COMMISSION QUALIFICATIONS

In order to qualify to receive commissions and bonuses, a Distributor must be in good standing and comply with the terms of the Agreement and these Policies and Procedures.

## 10.2 – ERRORS OR QUESTIONS

If a Distributor has questions about or believes any errors have been made regarding commissions, bonuses, Downline Activity Reports, or charges, the Distributor must notify MonaVie in writing within 60 days of the date of the purported error or incident in question. MonaVie will not be responsible for any errors, omissions, or problems not reported to the Company within 60 days.

## 10.3 – BONUS BUYING PROHIBITED

Bonus buying is strictly and absolutely prohibited. Bonus buying includes: (a) the enrollment of individuals or entities without the knowledge of and/or execution of an Independent Distributor Agreement by such individuals or entities; (b) the fraudulent enrollment of an individual or entity as a Distributor or Customer; (c) the enrollment or attempted enrollment of non-existent individuals or entities as Distributors or Customers ("phantoms"); (d) purchasing MonaVie products or services on behalf of another Distributor or Customer, or under another Distributor's or Customer's I.D. number, to qualify for commissions or bonuses; (e) purchasing excessive amounts of goods or services that cannot reasonably be used or resold in a month; and/or (f) any other mechanism or artifice to qualify for rank advancement, incentives, prizes, commissions, or bonuses that is not driven by bona fide product or service purchases by end user consumers.

## 10.4 – ADJUSTMENTS TO BONUSES AND COMMISSIONS

### 10.4.1 Returned Products

Distributors receive bonuses and commissions based on the actual sales of products and services to end consumers. When a product is returned to MonaVie for a refund or is repurchased by the Company, either of the following may occur at the Company's discretion: (1) the bonuses and commissions attributable to the returned or repurchased product(s) will be deducted from the pay period in which the refund is given, and continuing every pay period thereafter until the commission is recovered, from the Distributors who received bonuses and commissions on the sales of the refunded products or (2) the Distributors who earned commissions based on the sale of the returned products will have the corresponding points deducted from their Group Volume in the next pay period and all subsequent pay periods until it is completely recovered.

## 10.5 – REPORTS

All information provided by MonaVie, including but not limited to personal and group sales volume (or any part

thereof), and downline sponsoring activity is believed to be accurate and reliable. Nevertheless, due to various factors, including but not limited to the inherent possibility of human and mechanical error; the accuracy, completeness, and timeliness of orders; denial of credit card and electronic check payments; returned products; credit card and electronic check charge-backs, the information is not guaranteed by MonaVie or any persons creating or transmitting the information.

All personal and group sales volume information is provided "as is" without warranties, express or implied, or representations of any kind whatsoever. In particular but without limitation there shall be no warranties of merchantability, fitness for a particular use, or non infringement.

To the fullest extent permissible under applicable law, MonaVie and/or other persons creating or transmitting the information will in no event be liable to any Distributor or anyone else for any direct, indirect, consequential, incidental, special, or punitive damages that arise out of the use of or access to personal and group sales volume information (including but not limited to lost profits, bonuses, or commissions, loss of opportunity, and damages that may result from inaccuracy, incompleteness, inconvenience, delay, or loss of the use of the information), even if MonaVie or other persons creating or transmitting the information shall have been advised of the possibility of such damages. To the fullest extent permitted by law, MonaVie or other persons creating or transmitting the information shall have no responsibility or liability to you or anyone else under any tort, contract, negligence, strict liability, products liability, or other theory with respect to any subject matter of this agreement or terms and conditions related thereto.

## SECTION 11 – PRODUCT GUARANTEES, RETURNS, AND INVENTORY REPURCHASE

## 11.1 – CUSTOMER SATISFACTION GUARANTEE

MonaVie offers, through its Distributors, a 100% 30-day money-back guarantee to all retail customers. Every Distributor is bound to honor the retail customer guarantee. If, for any reason, a retail customer is dissatisfied with any MonaVie product, the retail customer may return the unused portion of the product to the Distributor from whom it was purchased, within 30 days, for a replacement, exchange or a full refund of the purchase price (including shipping costs, if applicable).

A Customer who makes a purchase of $25.00 or more has three business days (72 hours) after the sale or execution of a contract to cancel the order and receive a full refund consistent with the cancellation notice on the retail receipt. When a Distributor makes a sale or takes

an order from a retail customer who cancels or requests a refund within the 72 hour period, the Distributor must promptly refund the Customer's money as long as the products are returned to the Distributor in substantially as good condition as when received. Additionally, Distributors must verbally inform Customers of their right to rescind a purchase or an order within 72 hours, and ensure that the date of the order or purchase is entered on the retail receipt. All retail customers must be provided with two copies of an official MonaVie sales receipt at the time of the sale. The back of the receipt provides the Customer with written notice of their rights to cancel the sales agreement.

## 11.2 – RETURN OF INVENTORY AND SALES AIDS BY DISTRIBUTORS UPON CANCELLATION

Within 30 days, and upon cancellation of a Distributor's Agreement, the Distributor may return their Starter Kit and any products and sales aids held in their inventory for a refund. Distributors may only return Starter Kits, products, and sales aids that they personally purchased from MonaVie (purchases from other Distributors or third parties are not subject to refund) and which are in Resalable condition. Upon receipt of a Resalable Starter Kit and/or Resalable products and sales aids, the Distributor will be reimbursed 90% of the net cost of the original purchase price(s). Shipping charges incurred by a Distributor when the Starter Kit, products, or sales aids were purchased will not be refunded. If the purchases were made through a credit card, the refund will be credited back to the same account. If a Distributor was paid a commission based on a product(s) purchased, and such product(s) is subsequently returned for a refund, the commission that was paid based on that product purchase will be deducted from the amount of the refund.

### 11.2.1 Local and State Laws

Local and state laws with specific consumer return policies supersede those contained in this agreement.

## 11.3 – PROCEDURES FOR ALL RETURNS

All products deemed Resalable may be returned for a 90% refund. Sales aids and shipping fees are nonrefundable. The following procedures apply to all product returns for refund, repurchase, or exchange:

### 11.3.1 All merchandise must be returned by the Distributor or Customer who purchased it directly from MonaVie.

### 11.3.2 All products to be returned must have a Return Merchandise Authorization number which is obtained by calling the Distributor Services department. This Return Merchandise Authorization number must be written on each carton

returned. Return Merchandise Authorizations are valid for 30 days from the date of issue.

### 11.3.3 Proper shipping carton(s) and packing materials are to be used in packaging the product(s) being returned for replacement. All returns must be shipped to MonaVie pre-paid. MonaVie does not accept shipping-collect packages. The risk of loss in shipping for returned product shall be born by the Distributor. If returned product is not received by the Company's Distribution Center, it is the responsibility of the Distributor to trace the shipment.

### 11.3.4 If a Distributor is returning merchandise to MonaVie that was returned to them by a personal retail customer, the product must be received by MonaVie within ten (10) days from the date on which the retail customer returned the merchandise to the Distributor, and must be accompanied by the sales receipt the Distributor gave to the Customer at the time of the sale.

## 11.4 – PRODUCT ABANDONMENT

An order transaction is considered complete only when the order has been paid for and the shipping or delivery method has been satisfied. If these conditions are not met within 90 days from the date of order, the Company reserves the right to determine the final outcome of the order at its sole discretion, and the ordering Distributor releases MonaVie from any further obligation or liability.

## SECTION 12 – DISPUTE RESOLUTION AND DISCIPLINARY PROCEEDINGS

### 12.1 – Disciplinary Sanctions

Violation of the Agreement, these Policies and Procedures, violation of any common law duty, including but not limited to any applicable duty of loyalty, any illegal, fraudulent, deceptive, or unethical business conduct, or any act or omission by a Distributor that, in the sole discretion of the Company, may damage its reputation or goodwill (such damaging act or omission need not be related to the Distributor's MonaVie business), may result, at MonaVie's discretion, in one or more of the following corrective measures:

- Issuance of a written warning or admonition;
- Requiring the Distributor to take immediate corrective measures;
- Imposition of a fine, which may be withheld from bonus and commission checks;
- Loss of rights to one or more bonus and commission checks;

- Withholding from a Distributor all or part of the Distributor's bonuses and commissions during the period that MonaVie is investigating any conduct allegedly contrary to the Agreement. If a Distributor's business is canceled for disciplinary reasons, the Distributor will not be entitled to recover any commissions withheld during the investigation period;

- Suspension of the individual's Distributor Agreement for one or more pay periods;

- Involuntary termination of the offender's Distributor Agreement;

- Any other measure expressly allowed within any provision of the Agreement or which MonaVie deems practicable to implement and appropriate to equitably resolve injuries caused partially or exclusively by the Distributor's policy violation or contractual breach;

- Instituting legal proceedings for monetary and/or equitable relief.

Each violation is reviewed on a case-by-case basis, and all disciplinary actions are at the sole discretion of MonaVie.

## 12.2 – GRIEVANCES AND COMPLAINTS

When a Distributor has a grievance or complaint with another Distributor regarding any practice or conduct in relationship to their respective MonaVie businesses, the complaining Distributor should first report the problem to their Sponsor who should review the matter and try to resolve it with the other party's upline sponsor. If the matter involves interpretation or violation of Company policy, it must be reported in writing to MonaVie's Compliance department, via email or regular mail. Compliance will review the facts and attempt to resolve the matter. If it is not resolved, it will be referred to the Distributor Conduct Review Committee for final review and possible disciplinary action.

## 12.3 – DISTRIBUTOR CONDUCT REVIEW COMMITTEE

The purpose of the Distributor Conduct Review Committee ("DCRC") is to review policy violations and determine disciplinary actions. The Compliance department solicits information from all involved parties and presents the same to the DCRC for final resolution and disciplinary action, up to and including termination of a Distributor Agreement.

Once the DCRC has made a decision, the decision will be communicated to the Distributor in writing.

## 12.4 – DISTRIBUTOR CONDUCT APPEALS COMMITTEE

If a Distributor wishes to appeal a decision made by the DCRC, they must do so in writing within 10 business days of the date of notification of decision. A decision will only

be reviewed by the Appeals Committee if new information or further supporting evidence has been provided. All cases will be reviewed on a monthly basis and notification will be provided accordingly. Please note that during the appeals process, all involved Distributor accounts will be placed on a complete business hold, and all commissions generated will be placed in an Escrow account until the matter is resolved.

Decisions mandated by the Distributor Conduct Appeals Committee are final and binding, and will not be further reviewed by the Company.

## 12.5 – MEDIATION

Prior to instituting arbitration, the parties shall meet in good faith and attempt to resolve any dispute arising from or relating to the Agreement through non-binding mediation. One individual who is mutually acceptable to the parties shall be appointed as mediator. The mediator's fees and costs, as well as the costs of holding and conducting the mediation, shall be divided equally between the parties. Each party shall pay its portion of the anticipated shared fees and costs at least 10 days in advance of the mediation. Each party shall pay its own attorneys fees, costs, and individual expenses associated with conducting and attending the mediation. Mediation shall be held in Salt Lake City, Utah, and shall last no more than two business days.

## 12.6 – ARBITRATION

If mediation is unsuccessful, any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Distributors waive all rights to trial by jury or to any court. All arbitration proceedings shall be held in Salt Lake City, Utah. All parties shall be entitled to all discovery rights pursuant to the Federal Rules of Civil Procedure. There shall be one arbitrator, an attorney at law, who shall have expertise in business law transactions with a strong preference being an attorney knowledgeable in the direct selling industry, selected from the panel which the American Arbitration Panel provides. Each party to the arbitration shall be responsible for its own costs and expenses of arbitration, including legal and filing fees. The decision of the arbitrator shall be final and binding on the parties and may, if necessary, be reduced to a judgment in any court of competent jurisdiction. This agreement to arbitration shall survive any termination or expiration of the Agreement.

Nothing in these Policies and Procedures shall prevent MonaVie from applying to and obtaining from any court

having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction, permanent injunction, or other relief available to safeguard and protect MonaVie's interest prior to, during, or following the filing of any arbitration or other proceeding or pending the rendition of a decision or award in connection with any arbitration or other proceeding.

## 12.7 – GOVERNING LAW, JURISDICTION, AND VENUE

Jurisdiction and venue of any matter not subject to arbitration shall reside exclusively in Salt Lake County, State of Utah. The Federal Arbitration Act shall govern all matters relating to arbitration. The law of the State of Utah shall govern all other matters relating to or arising from the Agreement. Notwithstanding the foregoing, and the arbitration provision in paragraph 11.6, residents of the State of Louisiana shall be entitled to bring an action against MonaVie in their home forum and pursuant to Louisiana law.

## SECTION 13 – PAYMENT AND SHIPPING

### 13.1 – RETURNED CHECKS

All checks returned by a Distributor's bank for insufficient funds will be re-submitted for payment. A $25.00 returned check fee will be charged to the account of the Distributor. After receiving a returned check from a Customer or a Distributor, all future orders must be paid by Credit Card, money order, or cashier's check. Any outstanding balance owed to MonaVie by a Distributor for NSF checks and returned check fees will be withheld from subsequent bonus and commission checks.

### 13.2 – RESTRICTIONS ON THIRD PARTY USE OF CREDIT CARDS AND CHECKING ACCOUNT ACCESS

Distributors shall not permit other Distributors or Customers to use their credit card, or permit debits to their checking accounts, to enroll or to make purchases from the Company, unless an official MonaVie Authorization Letter is on file with the Company prior to the transaction. This Authorization Letter is found in a Distributor's Virtual Office.

### 13.3 – SALES TAXES

The Company makes the assumption that all product ordered will be resold at the suggested retail price, and sales tax is collected and reported on that basis. The sales tax is based upon the tax rate in the jurisdiction to which the product is shipped. If you submit a current Sales Tax Exemption Certificate (STEC) from your resident state, we will not charge or collect sales tax on your orders shipped to that state. You will be responsible for tracking and reporting all sales and sales taxes due. Sales tax on orders placed before we receive a STEC will not be reimbursed. If you elect to provide an STEC, you must indemnify and hold MonaVie harmless regarding any liability that MonaVie incurs as a result of your failure to collect or remit sales taxes.

## SECTION 14 – RECLASSIFICATION AND CANCELLATION

### 14.1 – RECLASSIFICATION

From inception, each new applicant is classified as a Customer. If a Customer begins retailing MonaVie products and receives commissions on retail sales they will be reclassified as a Wholesale Customer. A Wholesale Customer may then choose to qualify as a Distributor and build a MonaVie business by remaining active for eight consecutive weeks, receiving a commission check for both Retail and Business Building Bonuses, and sponsoring one or more individuals into the business.

A Distributor's rank/classification is contingent upon meeting all qualifications for that pay period, and may change accordingly.

### 14.2 – CANCELLATION

A Distributor whose business is canceled will lose all rights as a Distributor. This includes the right to sell MonaVie products and services, and the right to receive future commissions, bonuses, or other income resulting from the sales and other activities of the Distributor's former downline sales organization. In the event of cancellation, Distributors agree to waive all rights they may have, including but not limited to property rights, to their former downline organization and to any bonuses, commissions, or other remuneration derived from the sales and other activities of their former downline organization.

A MonaVie participant has a right to cancel at any time, regardless of reason. Cancellation must be submitted in writing to the Company at its principal business address, or via email to cancel@monavie.com. The written notice must include the Distributor's signature, printed name, address, and Distributor I.D. Number.

### 14.3 – NON-RENEWAL

A Distributor may also voluntarily cancel their Distributor Agreement by failing to renew the Agreement on its anniversary date. The Company may also elect not to renew a Distributor's Agreement upon its anniversary date.

# SECTION 15 – DEFINITIONS

**ACTIVE DISTRIBUTOR:** A Distributor who satisfies the minimum Personal Sales Volume requirements, as set forth in the MonaVie Compensation Plan, to ensure that they are eligible to receive bonuses and commissions.

**AGREEMENT:** The contract between the Company and each Retailer/Distributor; includes the Distributor Agreement, the MonaVie Policies and Procedures, and the MonaVie Compensation Plan, all in their current form and as amended by MonaVie in its sole discretion. These documents are collectively referred to as the "Agreement."

**AUTOMATIC TELEPHONE DIALING SYSTEM:** Any equipment which has the capacity to: (a) store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers.

**CANCEL:** The termination of a Distributor's business. Cancellation may be either voluntary, involuntary, or through non-renewal.

**COMPENSATION PLAN:** The guidelines and referenced literature for describing how Distributors can generate commissions and bonuses.

**CUSTOMER:** A Customer who purchases MonaVie products and does not engage in building a business or retailing product.

**DISTRIBUTOR:** An individual who purchases product, generates retail sales and business building commissions, is active for eight consecutive weeks, and has personally sponsored one or more individuals.

**DOWNLINE REPORT/GENEALOGY REPORT:** A report generated by MonaVie that provides critical data relating to the identities of Distributors, sales information, and enrollment activity of each Distributor's Organization. This report contains confidential and trade secret information which is proprietary to MonaVie.

**GROUP SALES VOLUME:** The commissionable value of MonaVie products purchased directly from MonaVie through a Distributor's binary organization.

**Immediate Household:** Heads of household and dependent family members residing in the same house.

**LEVEL:** The layers of downline Customers and Distributors in a particular Distributor's Organization. This term refers to the relationship of a Distributor relative to a particular upline Distributor, determined by the number of Distributors between them who are related by sponsorship. For example, if A sponsors B, who sponsors C, who sponsors D, who sponsors E, then E is on A's fourth level.

**Network Marketing:** Any multilevel or network marketing business venture or marketing opportunities.

**ORGANIZATION:** The Customers and Distributors placed below a particular Distributor.

**OFFICIAL MONAVIE MATERIAL:** Literature, audio or video tapes, and other materials developed, printed, published, and distributed by MonaVie to Distributors.

**PERSONAL SALES VOLUME (PSV):** The value of products sold by the Company to a Distributor in a rolling calendar month.

**PLACEMENT:** Your position inside your Sponsor's organization.

**RECRUIT:** For purposes of MonaVie's Conflict of Interest Policy (Section 6.2), the term "Recruit" means the actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly, indirectly, or through a third party, another MonaVie Distributor or Customer to enroll or participate in another multilevel marketing, network marketing, or direct sales opportunity.

**RESALABLE:** Products shall be deemed "resalable" if each of the following elements is satisfied: 1) they are unopened and unused, 2) original packaging and labeling has not been altered or damaged, 3) they are in a condition such that it is a commercially reasonable practice within the trade to sell the merchandise at full price, and 4) the product contains current MonaVie labeling. Any merchandise that is clearly identified at the time of sale as nonreturnable, discontinued, or as a seasonal item, shall not be resalable.

**SPONSOR:** A Distributor who enrolls a Customer, Retailer, or another Distributor into the Company, and is listed as the Sponsor on the Distributor Agreement. The act of enrolling others and training them to become Distributors is called "sponsoring."

**STARTER KIT:** A selection of MonaVie training materials and business support literature that each new Independent Distributor may purchase. The Starter Kit is sold to Distributors at the Company's cost.

**UPLINE:** This term refers to the Distributor or Distributors above a particular Distributor in a sponsorship line up to the Company. Conversely stated, it is the line of sponsors that links any particular Distributor to the Company.

**WHOLESALE CUSTOMER:** An individual who purchases MonaVie products at wholesale, but who is not a participant in the MonaVie compensation plan.

©2007 MONAVIE INC.

**EXHIBIT C**



# CERTIFICATE OF ANALYSIS

### CELADRIN®
**Lot Number: 05N10053**

| | |
|---|---|
| **Method of Analysis:** | **Gas Chromatography equipped with FID (Flame Ionization Dector) using 3 to 4 point calibrations** |
| **Contents:** | **Esterified Fatty Acid Complex (EFAC)    75%**<br>**Other Fatty Acid                                     25%** |
| | **Active myristate level is greater than 20%** |
| **Physical Characteristics:** | **Appearance               Waxy Solid**<br>**Color                          Amber** |
| **Microbiological Control:** | **Total Plate Count       <100 (CFU/g)**<br>**Yeast & Mold              <10   (CFU/g)**<br>**E. Coli                        <3     (CFU/g)**<br>**Salmonella                 Negative**<br>**Staphylococcus          <10   (CFU/g)** |
| **Date Manufactured:** | **12/2006** |
| **Shelf Life:** | **2 Years** |

10845 Rancho Bernardo Rd., No. 105, San Diego, CA 92127

Phone (800) 323-1688 • (858) 674-8455 • Fax (858) 674-8460 • www.imagenetix.net

**24-7**
**pressrelease**

Press Release Contact Information:
Chris Johnson
Monavie Inc.
Public Relations
630 E. 14th St. #15
New York, NY
10009
Voice: 646-654-1692
E-Mail: Email us Here
Website: Visit Our Website

**MonaVie Coming Jan 8, 2005 - A Gift From The Amazon - Have you Heard the Buzz About the Amazing Amazon Acai Fruit Berry?**
*Oprah's website names Acai Fruit TOP Superfood and it is also touted by NBC's Matt Lauer as the 'Amazons Viagra', the Acai Fruit Berry is quickly gaining popularity.*

/24-7PressRelease.com/ - New York, NY, December 17, 2004. Top Health and Wellness company Monarch Health Sciences to Launch New Phyto-Blend Elixir MONAVIE on Jan 8, 2005 in Salt Lake City.

This is not a story of some explorer hacking his way through the jungle, searching for a forbidden city, and discovering some mystical fountain of youth. This is not a tale of the mythological healing powers of some exotic crop. This is, however, the true account of leading researchers and scientists who saw a health need and as a result, discovered an authentic solution.

This group of experts, led by Dr. Ralph Carson, realized that the world's population at large were not enjoying the health enhancing benefits found in some of nature's most wondrous fruits. And that through the proper intake of the right variety and balance of fruits, grown and harvested in some of the richest soils of the world, individuals could benefit from critically important nutrients that are so illusive in today's polluted environment. Together they made a discovery that they believe, can significantly impact the landscape of personal wellness because of 4 important factors.

Factor #1 - The Forgotten Fruits
Evidence is clear that throughout the world, individuals are not eating enough fresh fruit. Whether this is due to convenience, cost, or taste, culturally the world has moved toward cheaper, processed alternatives rather than raw whole fruits. Dietary trends have eliminated much of the health benefits nature has to offer. In many ways, all fruits have become forgotten.

Factor #2 - A Wide Variety
When fruits are actually remembered, it is just a few: an apple here, a banana there. If additional fruits are considered, people instantly look for that single cure-all nutrient, hoping it will be contained in a particular berry or melon. Consider the body with all of its functions and processes; it is unreasonable to assume a single substance can aid all of the body's faculties.

Factor #3 - Color Me Beautiful
Simply put, fruit with rich color equals fruit rich with nutrients. It is all about the pigments. Brightly colored fruit naturally contain high levels of antioxidants and phyto-nutrients for the plant's own protection. The brighter and deeper the pigments, the more intense and potent the nutrient levels.

Factor #4 - Wear and Tear
Even with the full impact of all the nutrients available in fruits, due to wear and tear, the body still requires more assistance. Once the damage is done, two natural substances can help: Celadrin and Glucosamine. Celadrin lubricates the body's cells and revitalizes the membranes that cushion the bones and joints. While Glucosamine restores flexibility and is the natural building block of healthy cartilage. Helping repair previous damage paves the way for the benefits of fruits to have full sway in the body.

The Solution
Step one was to find the perfect combination and variety of fruits, rich in pigments. If the right fruit was rare or expensive it still was to be used—compromise was not an option. Step two, puree them in their entirety—flesh, skin, and seed so as to capture all the rich nutrients. Step three, include the repairing benefits of Celadrin and Glucosamine enabling the body to enjoy the full benefit of these sometimes forgotten, yet wonderful fruits. And the final step was to elegantly bottle the juice with the natural ingredients that enable prompt results.

The solution is MonaVie.

MonaVie provides the full impact of what fruit really has to offer: This polished product the perfect blend of rare and lesser-consumed fruits from the 4 corners of the earth that are enormously rich with nature's benefits. It is not a mixture of mythical juices; it is just good science.

With each bottle of MonaVie purchased, a portion of your proceeds will be donated to help preserve the Amazon rainforest. MonaVie's roots are entrenched in the Amazon. The Amazon is a region of superlatives: it spans the borders of eight countries; it is the world's largest river basin and the source of one-fifth of the Earth's freshwater; it has the world's high diversity of birds and freshwater fish; it is the planet's largest and most luxuriant rainforest in which, amazingly, live more than one third of all species in the world. Despite its natural richness, the Amazon ecosystem is fragile and in peril.

Make a Difference in the World. Drink Life… Drink MonaVie™

More MLM and Network Marketing leaders as well as many Top corporate individuals are aligning themselves with the MonaVie Acai Juice product and Monarch Health Sciences.

We are currently looking for team leaders for the following countries: USA, Canada, Singapore, Puerto Rico, Australia

We will be opening many more countries starting in 2005.
We are currently looking for team leaders to help with International Expansion and we are offering free Signup and free Website marketing systems at no cost to you but for a limited time only. So act soon !

For addtional information about MonaVie please visit:
http://www.monavieberry.com

Monarch Health Sciences is releasing it's flagship product MonaVie on January 8, 2005. Monavie is produced from acai berries from the Amazon jungle.



PR News Now : News at the Speed of Now.

# MonaVie Acai Berry Juice Has Arrived ACAI Berry Named Top Superfood for AntiAging by Dr Nicho

February 16, 2005 – ACAI Berry Named Top 10 Superfoods for Anti-Aging by Dr. Nicholas Perricone. Dr. Perricone is the author of the best selling title "The Perricone Promise"

The benefits from eating healthy are endless. And, according to Dr. Nicholas Perricone, some foods can be eaten to help you look and age better! At the top of the list is the acai fruit from the Amazon forest.

A previously little-known fruit harvested from the Brazilian rainforest is now gaining recognition for its high levels of the cholesterol-fighting fatty acids, Omega 6 and Omega 9, and its strong concentration -- up to 33 times that found in red wine grapes – of anthocyanin, a powerful anti-oxidant.

The acai berry is especially noteworthy for the antioxidant properties afforded by its concentration of anthocyanin – which is also present in red wine -- that prevents oxidants from harming connective tissue while repairing damaged proteins in blood vessel walls. This helps explain the "French Paradox." The French, who are noted wine drinkers, have one of the lowest incidences of heart disease of any westernized society despite a diet high in cholesterol and saturated fat.

Monavie Acai Berry Juice with Celadrin and Glucosamine is here.

One of the key and most phenomenal ingredients in this amazing Monavie juice is the acai berry. For the past ten years it has been studied by scientists globally. It has been scientifically proven to work dramatically and rapidly as an incredible natural remedy and cure for ailments such as inflammation, arthritis, cardiovascular health as well as many other nutritional deficiencies. Monavie contains 18 other fruits as well. Monavie Juice also has Celadrin and Glucosamine.Are you looking for the right Health Fruit Juice

The solution is MonaVie. MonaVie provides the full impact of what fruit really has to offer: This polished product is the perfect blend of rare and lesser-consumed fruits from the 4 corners of the earth that are enormously rich with nature's benefits. It is not a mixture of mythical juices; it is just good science.

This is not a story of some explorer hacking his way through the jungle, searching for a forbidden city, and discovering some mystical fountain of youth. This is not a tale of the mythological healing powers of some exotic crop. This is, however, the true account of leading researchers and scientists who saw a health need and as a result, discovered an authentic solution.

This group of experts, led by Dr. Ralph Carson, realized that the world's population at large were not enjoying the health enhancing benefits found in some of nature's most wondrous fruits. And that through the proper intake of the right variety and balance of fruits, grown and harvested in some of the richest soils of the world, individuals could benefit from critically important nutrients that are so illusive in today's polluted environment. Together they made a discovery that they believe, can significantly impact the landscape of personal wellness because of 4 important factors.

Factor #1 - The Forgotten Fruits
Evidence is clear that throughout the world, individuals are not eating enough fresh fruit. Whether this is due to

Buy MonaVie Online Now
Acai Amazon Berry Helped Lower My Cholesterol, Trigiserites and BP
www.mymonavie.com/talmadge
Acai Better Than Monavie
Natural Organic Acai $19.95 100% Guaranteed - $5 Ship Over $99
www.TheTotalHealthShop.com
Buy NOW Acai Juice
$11.99 for 32 oz of Acai Juice Shipping discount on orders +$75
herbalremedies.com/acai-juice
Pure Acai Berry Extract
Super Potent 1200mg Acai Berry More Acai Berry for Your Money!
www.HealthyChoiceNaturals.com
Ads by Google

Case 3:08-cv-00814-JLS-POR Document 1 Filed 05/05/2008 Page 67 of 71

convenience, cost, or taste, culturally the world has moved toward cheaper, processed alternatives rather than raw whole fruits. Dietary trends have eliminated much of the health benefits nature has to offer. In many ways, all fruits have become forgotten.

Factor #2 - A Wide Variety
When fruits are actually remembered, it is just a few: an apple here, a banana there. If additional fruits are considered, people instantly look for that single cure-all nutrient, hoping it will be contained in a particular berry or melon. Consider the body with all of its functions and processes; it is unreasonable to assume a single substance can aid all of the body's faculties.

Factor #3 - Color Me Beautiful
Simply put, fruit with rich color equals fruit rich with nutrients. It is all about the pigments. Brightly colored fruit naturally contain high levels of antioxidants and phyto-nutrients for the plant's own protection. The brighter and deeper the pigments, the more intense and potent the nutrient levels.

Factor #4 - Wear and Tear
Even with the full impact of all the nutrients available in fruits, due to wear and tear, the body still requires more assistance. Once the damage is done, two natural substances can help: Celadrin and Glucosamine. Celadrin lubricates the body's cells and revitalizes the membranes that cushion the bones and joints. While Glucosamine restores flexibility and is the natural building block of healthy cartilage. Helping repair previous damage paves the way for the benefits of fruits to have full sway in the body.

The Solution
Step one was to find the perfect combination and variety of fruits, rich in pigments. If the right fruit was rare or expensive it still was to be used-compromise was not an option. Step two, puree them in their entirety-flesh, skin, and seed so as to capture all the rich nutrients. Step three, include the repairing benefits of Celadrin and Glucosamine enabling the body to enjoy the full benefit of these sometimes forgotten, yet wonderful fruits. And the final step was to elegantly bottle the juice with the natural ingredients that enable prompt results.

The solution is MonaVie.
MonaVie provides the full impact of what fruit really has to offer: This polished product is the perfect blend of rare and lesser-consumed fruits from the 4 corners of the earth that are enormously rich with nature's benefits. It is not a mixture of mythical juices; it is just good science.

With each bottle of MonaVie purchased, a portion of your proceeds will be donated to help preserve the Amazon rainforest. MonaVie's roots are entrenched in the Amazon. The Amazon is a region of superlatives: it spans the borders of eight countries; it is the world's largest river basin and the source of one-fifth of the Earth's freshwater; it has the world's highest diversity of birds and freshwater fish; it is the planet's largest and most luxuriant rainforest in which, amazingly, live more than one third of all species in the world. Despite its natural richness, the Amazon ecosystem is fragile and in peril.

Make a Difference in the World. Drink Life... Drink MonaVie

More MLM and Network Marketing leaders as well as many Top corporate individuals are aligning themselves with the MonaVie Acai Juice product and Monarch Health Sciences.

We are currently looking for team leaders for the following countries: USA, Canada, Singapore, Puerto Rico, Australia

We will be opening many more countries starting in 2005. We are currently looking for team leaders to help with International Expansion and we are offering Free Website marketing systems at no cost to you but for a limited time only. So act soon!

For addtional information about MonaVie please visit: http://www.AcaiBerryJuice.com

**MonaVie Acai Berry Juice Has Arrived ACAI Berry Named Top Ten Superfood for AntiAging by Dr Nicho**

| **The Truth About Monavie** | **The Acai Berry Capsules** | **Acai Berry Benefits** | **"How I Lost 55** |
|---|---|---|---|
| You Must Read Before Trying Monavie Health Drink. TheGreatProduct.com | Full-Strength Acai Berry Capsules. Same Great Benefits, No Bad Taste! www.HealthyChoiceNaturals.com | Learn more about Acai Benefits On Sale Today - Buy Online acai-benefits.biossential.com/ | Amazing Chinese Secret As Seen O & Fox News www.Wu-YiSourc |

***Note This page is an Archieve of Publicly released information either through our company or another Press Release organization. We do not "fact check", "Support", nor "Dispute" any of the information provided to us. We are a distribution point and Historical press release research and search service. This information only represents the fact that at one point in time the release was distributed to 1000's of publications both online and off. PRNewsNow will not take sides in any personal or commercial disputes you have with the writer of this press release. We will defend its right to exist blindly and without regards to its political, commercial or personal implications.***

Last 1000 Press release and Blog Site Map



JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| IMAGENETIX, INC., a Nevada Corporation | MONAVIE LLC, a Utah Limited Liability Company, et al.; see Attachment "A" to Civil Cover Sheet for add'l defendants |
| **(b)** County of Residence of First Listed Plaintiff ~~California~~ San Diego (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant Utah (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. BY _KNH_ DEPUTY |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) Erwin Shustak; Jonah Toleno - SHUSTAK & PARTNERS, P.C. 401 West A St., Ste 2330, San Diego, CA 92101 (619.696.9500) | Attorneys (If Known) 08 CV 0814 JLS POR |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☒ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
(Lanham Act) 15 U.S.C. §§ 1114, 1116, and 1125

Brief description of cause:
Trademark infringement; trademark dilution; unfair competition; false advertising

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ ≥ $2,750,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE
05/05/2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 150554    AMOUNT $350    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

B 05/05/08

**ATTACHMENT "A"**
**to**
**CIVIL COVER SHEET**
(Defendants named in addition to DEFENDANT MONAVIE LLC)


(additional defendants): MONA VIE, INC., a Utah Corporation; MONARCH HEALTH SCIENCES, INC, a Utah Corporation; DALLIN LARSEN, HENRY MARSH, DELL BROWN, RANDY LARSEN, AMY COWLEY, JOHN BRIGHAM HART (a/k/a BRIG HART), LITA HART, STEVEN MERRITT, GINA MERRITT, CORBIN ROUSH, HOLLY ROUSH, CHARLES KALB, DEBORAH KALB, RONALD PRUDHOMME, BRENDA PRUDHOMME, EDWARD ARISTIZABAL, SHELLY ARISTIZABAL, BRIAN CATTANO, JILL CATTANO, MATTHEW CURTIS, KIMBERLY CURTIS, TINA DUPART (a/k/a TINA DAOUST), TODD HARTOG, ANGELIQUE HARTOG, RODNEY HOWARD-BROWNE, ADONICA HOWARD-BROWNE, MICKEY KARSHNER (a/k/a MICK KARSHNER), VICTORIA KARSHNER, JASON LYONS, CARRIE LYONS, ANGEL MATOS, GRAYSON MAULE, KEN PORTER, ROBERT ROBINSON, LINDA ROBINSON, DEVON ROBINSON, TODD SMITH, (a/k/a RICHARD TODD SMITH), STEPHANIE SMITH, FRANK SOUCINEK JR., CYNTHIA SOUCINEK, BRIAN THAYER, JACQUELINE THAYER, BO VANPELT, CARRIE VANPELT, as individuals; BLACK DIAMOND UNIVERSITY, INC., a California Corporation; DARRELL UTTERBACH, TRACY UTTERBACH, JOSEPH LICCIARDI, PATRICE LICCIARDI, ANDRE WALTON, (a/k/a KENNETH ANDRE WALTON), PENNY WALTON, JAMES BELLACERA, (a/k/a JIM BELLACERA), DENISE BELLACERA, KELLY BANGERT, JILLIAN BANGERT, ERIC M. GUTMAN, and REBEKAH GUTMAN, as individuals, and DOES 1 through 10,000, inclusive,


Defendants.

**UNITED STATES**
**DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 150554   — MB**

**May 05, 2008**
**13:42:02**

**Civ Fil Non—Pris**
USAO #.: 08CV0814 CIVIL FILING
Judge..: JANIS L. SAMMARTINO
Amount.:              $350.00 CK
Check#.: BC4139

**Total—> $350.00**

FROM: IMAGENETIX INC VS
        MONAVIE LLC, ET AL